Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 14, 2007    Decided July 3, 2007

No. 06-5354

CITIZENS EXPOSING TRUTH ABOUT CASINOS,
A MICHIGAN NON-PROFIT CORPORATION,
APPELLANT

v.

DIRK KEMPTHORNE, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT
OF THE INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 02cv01754)

———

*John J. Bursch* argued the cause for appellant.  On the briefs were *Rebecca A. Womeldorf*, *Robert J. Jonker*, *Daniel P. Ettinger*, and *Joseph A. Kuiper*.

*Aaron P. Avila*, Attorney, U.S. Department of Justice, argued the cause for appellees Dirk Kempthorne, et al.  With him on the brief was *Todd S. Aagaard*, Attorney.  *Lisa E. Jones*,

Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney, entered appearances.

*Reid Payton Chambers* argued the cause for appellee Nottawaseppi Band of Huron Potawatomi Indians. With him on the brief were *Mary J. Pavel*, *Arthur Lazarus, Jr.*, and *Addie C. Rolnick*. *Vanessa L. Ray-Hodge* entered an appearance.

*Michael A. Cox*, Attorney General, Attorney General's Office of the State of Michigan, *Thomas L. Casey*, Solicitor General, and *Todd B. Adams*, Assistant Attorney General, were on the brief of *amici curiae* State of Michigan and Michigan Governor Jennifer M. Granholm in support of appellee.

Before: SENTELLE, ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In 2002, the Assistant Secretary of the Bureau of Indian Affairs of the Department of Interior decided to take 78.26 acres of farmland in Calhoun County, Michigan into trust for use by the Nottawaseppi Huron Band of Potawatomi Indians ("the Band") to construct and operate a Class III gambling casino under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq*. This followed federal recognition of the Band in 1995. A non-profit Michigan membership organization — Citizens Exposing Truth About Casinos ("Citizens") — sued the Secretary and Assistant Secretary (hereafter, "the Secretary"), in part challenging the Secretary's determination that the proposed site was within the "initial reservation" exception, *id*. § 2719(b)(1)(B)(ii), to IGRA's general prohibition on gaming on trust land acquired after October 17, 1988, *id*. § 2719(a), and thus exempting it from the community protection provision in § 2719(b)(1)(A)

before opening a casino at the site. Citizens now appeals the district court's grant of summary judgment to the Secretary, contending that in deferring to the Secretary's interpretation of the exception the district court ignored both the letter and intent of Congress. We affirm.

## I.

Two statutes are relevant to this appeal, the first authorizing the Secretary to acquire lands for Indian tribes and the second authorizing the Secretary to regulate gaming on Indian reservations. After reviewing these statutes, we turn to the proceedings underlying this appeal.

### A.

Under the Indian Reorganization Act ("IRA"), the Secretary may acquire lands for the purpose of providing land for Native Americans. 25 U.S.C. § 465. Title to such land is "taken in the name of the United States in trust for the . . . tribe or individual . . . for which the land is acquired." *Id.* The Secretary is authorized to designate such lands as part of the tribe's reservation. *Id.* § 467. Interior Department regulations provide that the Secretary may make in-trust acquisitions "[w]hen the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." 25 C.F.R. § 151.3(a)(3). The regulations, as well as the Secretary's Guidelines on proclamation of reservations, define a "reservation" as "that area of land over which [the] tribe is recognized by the United States as having governmental jurisdiction." *Id*. § 151.2(f); 1997 Dep't of the Interior Guidelines for Proclamations ("Guidelines"). The Guidelines state that once such land is granted trust status, the Secretary can proclaim it to be a reservation and the tribe then may take advantage of special federal assistance; the proclamation also clarifies tribal jurisdiction over the trust

property.  Guidelines at 2.

IGRA, enacted in 1988, was designed "in large part to 'provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments,'" *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 865 (D.C. Cir. 2006) (quoting 25 U.S.C. § 2702(1)), and "to ensure that the . . . tribe is the primary beneficiary of the gaming operation."  25 U.S.C. § 2702(2).  A tribe may conduct gaming only on "Indian lands" within its jurisdiction.  *Id.* § 2710(b)(1), (d)(1)(A)(I).  "Indian lands" are defined as:

> (A) all lands within the limits of any Indian reservation; and
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

*Id*. § 2703(4).  However, gaming regulated under IGRA may not be conducted on lands the Secretary acquired in trust for a tribe after October 17, 1988, unless one of the exceptions applies.  One exception allows gaming when "lands are taken into trust as part of . . . the "initial reservation" of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process."  *Id*. § 2719(b)(1)(B)(ii).  The statute does not define "reservation" or "initial reservation."  In 2001, Congress clarified that the Secretary is authorized under IGRA to determine whether specific land is a reservation for purposes of IGRA.  *See* 2002 Dep't of the Interior and Related Agencies Appropriations Act, Pub. L. No. 107-63, § 134, 115 Stat. 414,

442-43 (2001) ("Appropriations Act").[1] Afterward, by Memorandum of Agreement, the Secretary and the National Indian Gaming Commission, which administers IGRA, 25 U.S.C. § 2706(b)(10), agreed that the Secretary is to determine whether a tribe meets one of IGRA's exceptions when the Secretary decides to take land into trust for gaming. *See* Mem. of Agreement between the Nat'l Indian Gaming Comm'n and the Dep't of the Interior (Feb. 26, 2007).

IGRA also addresses the effects on the local community where gaming will be conducted. Unless one of the exceptions applies, when a tribe wishes to conduct gaming on newly acquired lands, it must obtain the prior concurrence of both the Secretary and the appropriate State Governor that operating a casino on the tribe's land "would not be detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A).

**B.**

The Band is a descendent of the Potawatomi Tribe of

---

[1] Section 134, Clarification of the Secretary of the Interior's Authority Under Sections 2701-2721 of Title 25, United States Code, provides:

> The authority to determine whether a specific area of land is a "reservation" for purposes of sections 2701-2721 of title 25, United States Code, was delegated to the Secretary of the Interior on October 17, 1988: Provided, That nothing in this section shall be construed to permit gaming under the Indian Gaming Regulatory Act on the lands described in section 123 of Public Law 106-291 or any lands contiguous to such lands that have not been taken into trust by the Secretary of the Interior.

Appropriations Act, § 134, 115 Stat. at 442-43.

Huron, Michigan, which signed treaties with the United States from 1795 through 1833. It unsuccessfully petitioned for federal recognition in 1934. Prior to federal recognition in 1995, the Band had been living on a 120-acre piece of property in Athens Township, Michigan since the mid-1840s. The property, Pine Creek, was privately acquired by the Band in the 1840s; as of 1995, fifteen members of the Band were living on it and 183 other members lived within a twenty mile radius of it. From 1845 the Governor of Michigan has arguably held title to the Pine Creek property on behalf of the Band, but the status of the property is in dispute because the State claims that it lacks authority to hold land in trust as a reservation for an Indian tribe. *See* Amicus Br. of the State of Mich. at 4. Although the Band calls the property home, the Band does not exercise governmental jurisdiction over the Pine Creek property, such as authority over land use, law enforcement, building codes, zoning, education, fire service, or judiciary. Neither the Secretary nor the State has recognized the property as Indian lands.

On December 11, 1999, the Band submitted an application for the Secretary to acquire several parcels of land under the IRA in trust for the Band. Ultimately, the Band only proceeded with one parcel, a 78.26 acre property known as the Sackrider property, located in Emmett Township in Calhoun County, Michigan. In May 2000, the Secretary sent consultation letters to the state and local governments with regulatory jurisdiction over the land, and three months later gave notice in the Federal Register of the intention to acquire the Sackrider property in trust for the Band, *see* 67 Fed. Reg. 51,867 (Aug. 9, 2002). The notice stated that the Band had no trust property at the time of its federal recognition in 1995 and that on December 13, 2000, the Associate Solicitor for Indian Affairs had opined that the Sackrider property was "within the geographical region anticipated as part of the Band's land base" and could be

included in the initial proclamation of reservation because it would meet the requirements of the "initial reservation" exception in IGRA under 25 U.S.C. § 2719(b)(1)(B)(ii). 67 Fed. Reg. at 51,867 (citing Trust Acquisition for the Huron Potawatomi, Inc., Letter of Assoc. Solicitor at 2-3 (Dec. 13, 2000) ("2000 Op. Ltr.")).

On August 30, 2002, Citizens sued the Secretary, alleging that: (1) the Secretary had failed to comply with the National Environment Protection Act, 42 U.S.C. § 4321 *et seq.*; (2) there was no valid compact between the Band and the State with regard to acquisition of the 78.26 acre site; (3) the Secretary's authority to acquire land in trust for the Indians violated the non-delegation doctrine; and (4) the Sackrider property did not qualify for any of the exceptions to IGRA's general prohibition on gaming on trust lands acquired after October 17, 1998. On motions for summary judgment by the Secretary and by the Band, as intervenor, the district court granted the Secretary's motion on the statutory interpretation issue that is raised by Citizens on appeal. Observing that Citizens's "objective is to delay or, if possible, prevent the construction of the [Band's] proposed casino altogether," Mem. Op. of Apr. 23, 2004 at 5, the district court noted that Pine Creek's status as a state reservation is a matter of some disagreement but that it is "undisputed that the [Pine Creek] property is not a reservation under federal law, and therefore does not fall under the purview of IGRA," *id*. at 7. The district court concluded that inasmuch as the Secretary acts under the IRA in taking land into trust, the Secretary could reasonably conclude, upon applying the definition of "reservation" under the IRA regulations, that the Sackrider property qualified as an "initial reservation" under IGRA, 25 U.S.C. § 2719(b)(1)(B)(ii). *See id*. The district court rejected Citizens's argument that the Sackrider property could not be a "reservation" because it was not going be a residence for the Band, noting the absence of any such statutory or

regulatory requirement for land designated a reservation. *See id*. Citizens appeals, and our review of the grant of summary judgment is *de novo*. *See Wilson v. Peña*, 79 F.3d 154, 160 n.1 (D.C. Cir. 1996).

## II.

The Band, an appellee, contends that Citizens lacks prudential standing to challenge the Secretary's decision to take the Sackrider property into trust as the Band's "initial reservation," asking the court to revisit the decision in *TOMAC v. Norton*, 193 F. Supp. 2d 182, 190 (D.D.C. 2002), *aff'd*, 433 F.3d 852, 860 (D.C. Cir. 2006). In that case, "Taxpayers of Michigan Against Casinos" included as members residents who lived adjacent to another tribe's proposed casino site. Through TOMAC they sought injunctive and declaratory relief against the Secretary on grounds similar to those relied on by Citizens. *TOMAC*, 433 F.3d at 857-58. The district court rejected the challenge to TOMAC's prudential standing, *TOMAC*, 193 F. Supp. 2d at 187, citing *Florida Audubon Society v. Bentsen*, 94 F.3d 658, 672 (D.C. Cir. 1996) (en banc), and *Humane Society of the United States v. Hodel*, 840 F.2d 45, 53-59 (D.C. Cir. 1988). This court summarily affirmed this ruling, *TOMAC*, 433 F.3d at 860, also citing *National Credit Union Administration v. First National Bank & Trust Co*., 522 U.S. 479, 492 (1998). The court is bound by its precedent absent en banc review. *LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996) (en banc).

The Band maintains that private citizens seeking to restrict tribal gaming because of its impact on surrounding communities are not within the zone of interests protected by IGRA's "initial reservation" exception. In its view, the exception was intended to ensure that tribes not recognized in 1988 were not disadvantaged relative to tribes with established land bases in their ability to conduct gaming, and it is not concerned with

impacts on surrounding communities. The Band focuses on the fact that Congress did not require the Secretary in applying this exception to determine whether gaming on lands taken into trust would "be detrimental to the surrounding community."

Contrary to the Band's view, Citizens's claim is sufficiently congruent with congressional purpose because it seeks to enforce the provision that Congress included regarding affected communities. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998). Inclusion of this provision demonstrates that Congress could not have intended to preclude efforts to enforce it, even if enforcement might prevent a landless tribe from gaining the benefits of IGRA. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984). The rigors of prudential standing are not so onerous as to preclude Citizens's challenge. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400-01 (1987). The Band's reliance on *Grand Council of the Crees v. FERC*, 198 F.3d 950 (D.C. Cir. 2000), is misplaced; in that case, the court held that the non-economic, non-competitive injury alleged by the Council was outside the zone of interests of the Federal Power Act, 15 U.S.C. § 824d, an entirely different statutory scheme that did not include a provision for community protection comparable to that in IGRA, *see Grand Council*, 198 F.3d at 956; *see also Bennett v. Spear*, 520 U.S. 154, 175-76 (1997).

Accordingly, we hold that Citizens has prudential standing to challenge the Secretary's interpretation of IGRA's "initial reservation" exception.

**III.**

Citizens contends that it simply seeks to ensure that the Band complies with the community protection provision of IGRA, 25 U.S.C. § 2719(b)(1)(A), before operating a casino.

For that provision to apply, Citizens must demonstrate that the Secretary's decision to take the Sackrider Property into trust under the IRA and designate it under IGRA as the Band's "initial reservation" was based on an impermissible interpretation of the statute. We first address the nature of the deference due to the Secretary's interpretation of the "initial reservation" exception before turning to Citizens's reasons for contending that no deference is due.

**A.**

Usually, where the agency is interpreting a statute that Congress has authorized it to implement, the court's review follows the familiar two-step analysis in *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). If Congress has spoken to the question at issue, then that is the end of the matter. *Id*. at 842-43. But if Congress has left a gap in the statute or the text of the statute is ambiguous, then the court must determine if the agency's interpretation is permissible, and if so, the court must defer to it. *Id*. at 843. Citizens contends, however, that no *Chevron* deference is due to the Secretary's interpretation of IGRA's "initial reservation" exception for several reasons.

First, Citizens maintains no *Chevron* deference is due because the Gaming Commission, not the Secretary, is charged with administering IGRA. This ignores both the Secretary's substantial role in administering IGRA, most relevantly here in determining whether an exception to IGRA's gaming ban applies, and Congress's action in 2002 eliminating any doubt about the Secretary's authority to determine whether specific land is a "reservation" and overruling the legal premise of the Tenth Circuit's decision in *Sac & Fox Nation v. Norton*, 240 F.3d 1250 (10th Cir. 2001), not to defer to the Secretary. *See* Appropriations Act, *supra* note 1. To the extent that Citizens relies on *Citizens Against Casino Gambling in Erie County v. Kempthorne*, 471 F. Supp. 2d 295 (W.D.N.Y. 2007), which

relied on *Sac & Fox*, it is without persuasive force. This court has declined to follow the Tenth Circuit's lead. *See City of Roseville v. Norton*, 348 F.3d 1020, 1029 (D.C. Cir. 2003).

Second, Citizens maintains that no *Chevron* deference is due because the Secretary's interpretation does not carry the force of law. Citizens relies on *Christensen v. Harris County*, 529 U.S. 576, 586 (2000), where the Supreme Court held that an opinion letter was due no *Chevron* deference because it did not constitute the official exercise of delegated authority to enforce the Federal Labor Standards Act ("FLSA") against a particular employer. In that case, employees had sued their employer for alleged violations of the FLSA and sought to rely on the opinion letter to the employer from the Acting Administrator of the Wage and Hour Division of the Labor Department that stated that in the absence of an agreement with the employees, employers could not require employees to use compensatory time. The Supreme Court observed:

> [W]e confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference.

*Id*. at 587.

Neither the Supreme Court nor this court has read *Christensen* to have limited *Chevron* deference to rulemakings and formal adjudications only, much less to preclude *Chevron* deference to situations involving application of an agency's delegated authority to particular facts. In *United States v. Mead*

*Corp.*, 533 U.S. 218, 231 (2001), the Court acknowledged that even in the absence of notice and comment or administrative formality there may be reasons for according *Chevron* deference where an agency action has the force of law; *see also id.* at 231 n.13 (citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57 (1995)). *See Barnhart v. Walton*, 535 U.S. 212, 222 (2002). In *FEC v. National Rifle Ass'n of America*, 254 F.3d 173, 186 (D.C. Cir. 2001), this court held that advisory opinions of the Federal Election Commission ("FEC") that reflected its considered judgment made pursuant to congressionally delegated lawmaking power and that had binding legal effect were due *Chevron* deference. Contrasting the formality of the FEC opinion letters, the court noted that the Labor Department letter in *Christensen* neither bound the agency nor the requesting party and was not the result of a statutorily-created decision-making process. *Id*. The court further noted that virtually every post-*Christensen* decision that had declined to give *Chevron* deference did so in view of the informal agency procedures that were involved. *Id.* (citing cases). Other circuits have similarly understood the limits of *Christensen*'s holding. *See Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257, 1261-62 (11th Cir. 2002); *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002); *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1012 (9th Cir. 2002); *see also Navajo Nation v. Dep't of Health & Human Servs.*, 285 F.3d 864, 871-72 (9th Cir. 2002), *aff'd en banc on other grounds*, 325 F.3d 1133 (9th Cir. 2003).

*Christensen* is not controlling here. The Secretary's determination that the "initial reservation" exception applied to the Sackrider property was intended to have the force of law, as it formed the basis for the Secretary's decision under the IRA to acquire the property in trust for the Band. Citizens challenges the Secretary's exercise of express authority under the IRA and IGRA to acquire land in trust and proclaim reservations and to

determine what constitutes a "reservation." *Cf. Pharm. Research & Mfrs. of Am. v. Thompson*, 362 F.3d 817, 822 (D.C. Cir 2004). The Secretary gave formal public notice in the Federal Register of the determination and the basis for it, including the opinion letter on which the Secretary relied. Although publication in the federal register is not in itself sufficient to constitute an agency's intent that its pronouncement have the force of law, *see Christensen*, 529 U.S. at 587, where, as here, that publication reflects a deliberating agency's self-binding choice, as well as a declaration of policy, it is further evidence of a *Chevron*-worthy interpretation. As such, given the formal decision making process involved, *Chevron* applies.

### B.

In deciding to acquire the Sackrider property in trust for the Band, the Secretary relied on the opinion of the Acting Associate Solicitor of the Division of Indian Affairs. The opinion, set forth in a letter to the Midwest Regional Director of the Bureau of Indian Affairs, stated that the first time a federal reservation is proclaimed for the Band, it constitutes the "initial reservation" under 25 U.S.C. § 2719(b)(1)(B)(ii). 2000 Op. Ltr. at 2-3. The land must be placed in trust at or before the time of initial proclamation, and an "initial reservation" may only be requested once. The opinion letter explained that these procedures would put a newly recognized tribe in a position similar to tribes that had land in trust before the ban established in IGRA for lands acquired in trust after October 17, 1988. On appeal the Secretary maintains that this analysis rests upon the plain meaning of the phrase "initial reservation" to mean the first land taken into trust for a tribe under federal law and proclaimed a "reservation" under 25 U.S.C. § 467. This reading is consistent, the Secretary points out, with IGRA's purpose and the "initial reservation" exception because, as this court has recognized, IGRA's exception "ensur[es] that tribes lacking reservations when IGRA was enacted are not disadvantaged relative to more established

ones." *City of Roseville*, 348 F.3d at 1030. It is also consistent, the Secretary notes, with the "Indian canon of construction," which provides that ambiguous provisions enacted for the benefit of the Indians are to be liberally construed in their favor. *Id*. at 1032.

Against this interpretation Citizens offer two reason why the Secretary's interpretation of the "initial reservation" exception is impermissible: First, the Sackrider property is not a "reservation" because a "reservation" is only land used for residences of tribal members, and the Band intends to use the property for gaming; second, the Pine Creek property is the Band's "initial reservation," making the Sackrider property its second "reservation" at best. Neither reason survives scrutiny.

As support for its first reason, Citizens purports to find support for its interpretation of "reservation" as meaning the tribe's residence in Felix S. Cohen's *Handbook of Federal Indian Law* (1982 ed.) ("HANDBOOK"). The Secretary observes that that edition does not reflect the official position of the United States or the Secretary because it was contracted to the University of New Mexico School of Law, which ultimately privately copyrighted it. Appellees' Br. at 40. In any event, Citizens relies on a sentence stating that in the 1850s "the modern meaning of Indian reservation emerged, referring to land set aside under federal protection for the residence of tribal Indians." HANDBOOK, *supra*, at 34. In doing so Citizens does not acknowledge that the sentence is part of a historical discussion about the genesis of the term "Indian country" as used in 18 U.S.C. § 1151(a), which governs criminal jurisdiction and does not limit a "reservation" to land with houses. The *Handbook* explains that the term "reservation" originally meant land a tribe "reserved" to itself under a treaty, HANDBOOK*, supra*, at 34-35 & n.66, and that the term broadened to include lands that the United States set aside from public lands not

originally owned by the tribes for the tribes' use and occupation. *Id*. The term thus expanded to include "land set aside under federal protection for the residence of tribal Indians." *Id*.

Although this explanation appears at first to lend some support for Citizens's interpretation of "reservation," the *Handbook* concludes that the "use of the term 'reservation' from public land law soon merged with the treaty use of the word to form a single definition describing federally-protected Indian tribal lands without any particular dependence on source. This definition of the term 'reservation' has since been generally used and accepted." HANDBOOK, *supra*, at 34-35 n.66. Tellingly, in the "generally used and accepted" definition of "reservation," there is no reference to a requirement that the land be used as housing in order to qualify as a "reservation."

Second, Citizens relies on the Tenth Circuit's decision in *Sac & Fox*, 240 F.3d 1250, not to defer to the Secretary's interpretation of "reservation." But Congress overturned that decision, *see supra* note 1, and even if Congress has not so acted, this court has declined to follow *Sac & Fox*, *see City of Roseville*, 348 F.3d at 1029-30. Contrary to Citizens's suggestion that a later public law cannot amend an earlier enactment without actually changing the language of the statute, Section 134 is a free-standing statute that is to be given legal effect. *See Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509, 515 (D.C. Cir. 1993).

Third, in Citizens's view, the "established meaning" of "reservation" as meaning residence is consistent with Congress's intent. It says IGRA was designed to help minimize the "ill-effects of gambling," protect surrounding communities from gaming on Indian lands, and prohibit gaming on after-acquired lands unless the Secretary and the State governor determine gaming will not have a detrimental effect on the surrounding host

community. Appellant's Br. at 31-33. It is true that Congress intended for the Secretary to take into account the concerns of affected communities by requiring, in certain situations involving newly-acquired tribal land, that the Secretary and State governor concur that a casino on the tribe's land "would not be detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A). But this court has recognized that Congress's overarching intent was "in large part to 'provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," *TOMAC*, 433 F.3d at 865, and to do so "to ensure that the Indian tribe is the primary beneficiary of the gaming operation," 25 U.S.C. § 2702(1)-(2). Congress's primary purpose in enacting IGRA is evident as well from the inclusion of several exceptions to the gaming prohibition on after-acquired lands in order to allow newly acknowledged or restored tribes to engage in gaming on par with other tribes. *See City of Roseville*, 348 F.3d at 1030. So understood, as the Secretary points out, Citizens has overemphasized one provision in the overall structure of IGRA, which is insufficient to demonstrate no deference is due to the Secretary's statutory interpretation.

Fourth, Citizens maintains that the Secretary improperly seeks to incorporate regulations promulgated under the IRA into IGRA. But Citizens offers no reason, and we find none, why the Secretary could not reasonably view the two statutes in tandem. Congress enacted IGRA against the backdrop of its prior authorization in the IRA to the Secretary to take lands in to trust and to proclaim them a "reservation" for a tribe. As the district court pointed out, because the Secretary takes the lands in trust for a tribe under the IRA, it is consistent with IGRA for the Secretary to look to the IRA implementing regulations in concluding that a federally proclaimed "reservation" under the IRA would be a "reservation" for the purpose of IGRA's "initial

reservation" exception. *Cf. TOMAC*, 433 F.3d at 864-65; *Roseville*, 348 F.3d at 1031. To the extent that Citizens contends that applying the IRA's definition of "reservation" is inconsistent with IGRA's definition of "Indian lands," because Congress intended the terms to have different meanings, it fails to show that the Secretary treats the concepts of "reservation" and trust lands interchangeably. *Compare* 25 C.F.R. § 151.2(d) (defining "trust land"), *with id*. § 151.2(f) (defining "Indian reservation"). As the Secretary points out, "the Sackrider property would not qualify as a reservation until the Band applied for and obtained a reservation proclamation under 25 U.S.C. § 467." Appellees' Br. at 48.

Fifth, Citizens maintains that the Secretary "upset[s] the careful parity intended by IGRA" because "a newly acknowledged tribe would be in a far better position than an existing tribe from the standpoint of selecting a casino site." Appellant's Br. at 35. This argument might be more problematic had Congress not made clear its intent in enacting IGRA. As the court noted in *City of Roseville*, without the exceptions a tribe recognized prior to IGRA's enactment would have had opportunities to acquire new trust lands that a post-IGRA newly-federally recognized tribe would not have had. 348 F.3d at 1030. The Secretary persuasively explains that the purpose of the "initial reservation" exception is not to create parity in selecting a casino site, but rather "to 'grandfather' certain lands acquired after IGRA by treating them similarly to lands held by tribes already recognized at the time IGRA was adopted." 2000 Op. Ltr. at 3. This thereby ensures that such tribes are not precluded from gaming. The Senate Committee on Indian Affairs reported in describing IGRA's exceptions that they were meant to set "forth policies with respect to lands acquired in trust after [IGRA's] enactment." S. REP. NO. 100-446, at 20 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3090; no House Report on this legislation was submitted. Citizens's interpretation thus

misconstrues the purpose of the "initial reservation" exception and incorrectly suggests that a newly recognized tribe may select any piece of land for its casino site; under the IRA, the land must still be acquired in trust by the Secretary whose determination is based on a number of factors.  *See* 25 C.F.R. pt. 151.

In rejecting Citizens's first reason for denying deference to the Secretary's interpretation, then, we conclude that Citizens fails to demonstrate that the word "reservation" has an established meaning that would limit it to lands used for tribal housing.  We find no basis on which to conclude that the word "reservation" is unambiguous and has the asserted rigid meaning in the United States Code, *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1293 (D.C. Cir. 2000).  Because IGRA was designed primarily to establish a legal basis for Indian gaming as part of fostering tribal economic self-sufficiency, not to respond to community concerns about casinos, *see TOMAC*, 433 F.3d at 865; *City of Roseville*, 348 F.3d at 1030, it would appear to follow that the Secretary's interpretation that the "initial reservation" exception includes lands acquired in trust by the United States for a tribe and proclaimed a "reservation" by the Secretary under the IRA for use for a casino is permissible under *Chevron*.

Citizens's second reason for not according deference to the Secretary's interpretation focuses on the fact that the Pine Creek property has functioned as the Band's "reservation" for more than 120 years, thus making Sackrider property the Band's second reservation.  This reason conflates the question of the Band's historical home with the inquiry into the land's status for the purposes of IGRA, which are two distinct inquiries.  While the Band lived on the Pine Creek land during that time, there is some dispute, as the district court noted, with regard to the status of the Pine Creek property.  Apparently, the land was given to the Governor of Michigan to hold for the Band, but the State claims

that the Governor has no authority to hold land as a "state reservation" for a tribe. *See* Amicus Br. of the State of Michigan at 4. Citizens points to no legal basis on which this court could conclude that there is such a thing as a "state reservation" under Michigan law. Although Citizens points to statements by the Interior Department during the course of considering whether to grant the Band's application for federal recognition that the Pine Creek property is an official state reservation, *see* DEP'T OF THE INTERIOR, HISTORICAL REPORT ON HURON POTAWATOMI, INC. 4, 66 (1995), the Secretary points out that at that time the Department was not making an official finding regarding the state trust status of the Pine Creek property and the Department was aware of the long-standing controversy over the status of the Pine Creek property, *id.* at 66-67, 139-44.

The relevant inquiry is the status of the Pine Creek property under federal law. Citizens has failed to show that Pine Creek has any. It is undisputed that the United States does not hold the Pine Creek property in trust, that it is neither a federal reservation nor has it been proclaimed a "reservation" pursuant to 25 U.S.C. § 467, and that the Band does not exercise governmental authority over the property as is required, *see id.* § 2703(4)(B). In enacting the "initial reservation" exception, Congress did not indicate that it intended to include a state reservation over which a tribe did not exercise governmental jurisdiction. To the contrary, the structure of IGRA's prohibition on gaming on after-acquired lands and its exceptions indicate that Congress's frame of reference was federal reservations. The gaming prohibition in Section 2719(a) applies to lands acquired by the Secretary in trust for the benefit of a tribe after October 17, 1988, while Section 2719(b)(1)(B)(ii) makes subsection (a) inapplicable when such lands are taken, by the Secretary, as part of an "initial reservation" "under the Federal acknowledgment process," 25 U.S.C. § 2719(b)(1)(B)(ii). This statutory structure is incompatible with Citizens's position that Congress intended the

"initial reservation" exception to include state reservations, and would leave the Band without an "initial reservation" on which to game under IGRA — a result contrary to the rationale of the exception. Whether or not the Pine Creek property is held in trust by the State for the Band thus becomes irrelevant.

Moreover, Citizens's view would lead to anomalous results. It would be a remarkable proposition, the Secretary suggests, to conclude that lands to which the State of Michigan holds title, assuming Pine Creek were a state reservation within IGRA's "initial reservation" exception, would be subject to IGRA. Where Congress intended statutes to apply to both federal and state reservations, it has so stated in the statutory text. *See, e.g.*, 7 U.S.C. § 1926(a)(1); *id*. § 2662(a); 29 U.S.C. § 741(a); 42 U.S.C. § 2991b(a). Although Citizens points to provisions that refer to "federal Indian reservations"[2] or "Indian reservations under the jurisdiction of the United States,"[3] Citizens has pointed to no federal statute that uses the term "reservation" that has been applied to both federal and state reservations. As such, the Secretary has the better argument: When Congress intends a statute to apply to state reservations it ordinarily says so.

Ultimately, however, Citizens's view that the Sackrider property is a second "reservation" illustrates that Congress's use

---

[2] *See, e.g.*, 23 U.S.C. § 101(a)(25) (referring to "nontaxable Indian Lands, or other Federal reservations"); *id.* § 202(b)(1)(A) (same); 25 U.S.C. § 1644(a) (referring to "Federal Indian reservations and trust areas"); *id.* § 1678(b)(referring to "Federal reservations"); *id.* § 1683 (referring to "Federal Indian reservation"); 30 U.S.C. § 1291(9) (same); *id.* § 185(b)(1) (referring to "Federal reservation").

[3] *See, e.g.*, 7 U.S.C. § 1985(e)(1)(A)(ii) (referring to "any Indian reservation under the jurisdiction of the United States"); 18 U.S.C. § 1151 (same); 23 U.S.C. § 402(i)(4)(A) (same); 25 U.S.C. § 3902(3)(A) (same); 33 U.S.C. § 1377(h)(1) (same).

of the word "reservation" is ambiguous. The Secretary could reasonably conclude that the "initial reservation" exception of IGRA is to be read together with the "new Indian reservations" provision of Section 467 and that the "initial reservation" for purposes of Section 2719 is the land identified in the initial reservation proclamation under Section 467 after the tribe receives federal recognition. Here, the Sackrider property is included in the proposed reservation proclamation under Section 467 and thus qualifies as an "initial reservation" under Section 2719. Further, as IGRA is designed to promote the economic viability of Indian Tribes, the Indian canon of statutory construction requires the court to resolve any doubt in favor of the Band. *See City of Roseville*, 348 F.3d at 1032. *See generally County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992); *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985). Doing so avoids what the Secretary characterizes as another remarkable proposition whereby a state, not the Secretary, could create a tribe's "initial reservation" for the purposes of IGRA notwithstanding the "independent Federal regulatory authority for gaming on Indian lands" created in IGRA, 25 U.S.C. § 2702(3).

Accordingly, because the Secretary's interpretation of IGRA's "initial reservation" exception is due deference under *Chevron* and is a permissible interpretation that is consistent with the Indian canon of statutory construction, we affirm the grant of summary judgment to the Secretary.