*26 Opinion for the Court filed PER CURIAM.
Opinion dissenting in part by Circuit Judge BROWN.
PER CURIAM:
In 2005, the Assistant Secretary for Indian Affairs of the Bureau of Indian Affairs of the Department of Interior decided to take 147 acres of land in Wayland Township, Michigan, into trust for use by the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (“the Tribe”), which plans to construct and operate a Class III casino. This decision followed federal recognition of the Tribe in 1998. A non-profit Michigan membership organization — Michigan Gambling Opposition (“MichGO”)— sued the Secretary of the Interior, the Bureau of Indian Affairs (“BIA”) and the National Indian Gaming Commission (“NIGC”) (collectively the “DOI”) alleging that the DOI’s approval of the proposed casino violated the National Environmental Protection Act (“NEPA”), 42 U.S.C. § 4321 et seq., and that section 5 of the Indian Reorganization Act (“IRA”), 25 U.S.C. § 465, was unconstitutional. The district court granted summary judgment to the DOI, and MichGO appeals. We hold that the DOI did not violate NEPA and that section 5 of the IRA is not an unconstitutional delegation of legislative authority. Accordingly, we affirm.
I.
The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians has lived in Michigan continuously since it emerged as a recognizable unit under Chief Match-E-Be-Nash-She-Wish at the turn of the nineteenth century. At that time, the Tribe lived near Kalamazoo, Michigan, along the Kalamazoo River. The Tribe was party to several treaties with the United States, and it was adversely affected by several others, with the result that it lost all of its lands near Kalamazoo by the middle of the nineteenth century. It avoided being moved to reservations further west by taking asylum with a church mission in central Michigan, near the town of Bradley. Around the end of the nineteenth century, land in the church mission was distributed to individual members of the Tribe. This distribution was in accord, although not directly part of, broader federal policies of the time, which emphasized breaking up tribal holdings and distributing parcels of land to individuals. See Judith V. Royster, The Legacy of Allotment, 27 Ariz. St. L.J. 1, 10-12 (1995). Most of the land distributed to individual members of the Tribe was lost because of failure to pay property taxes, as was the ease for large portions of the land distributed under broader federal policies, id. at 12, but members of the Tribe continued to reside around the former church mission.
The Tribe, now numbering 277 members, secured federal acknowledgment of its existence in 1998, under the BIA’s formal recognition procedure. The Tribe and BIA plan for BIA to acquire land as a reservation for the Tribe, using the Secretary of the Interior’s authority under section 5 of the IRA to take land into trust for Indians, 25 U.S.C. § 465. They have identified a 147-acre tract of land (“the Bradley property”) that they find suitable for this purpose. The Bradley property is located in Wayland township (population 3,013), a largely rural area about twenty-five miles north of Kalamazoo and thirty miles south of Grand Rapids. Seeking to advance the economic well-being of its members, who suffer from unemployment rates approximately six times the average of their surrounding area, and to promote economic self-sufficiency, the Tribe plans to use the Bradley property to host a Class III gambling casino. The planned facility *27 would comprise approximately 99,000 square feet of gambling, with additional floor space devoted to restaurants, stores, and offices. The Tribe expects 8,500 visitors per day.
As BIA studied the Tribe’s proposal, it prepared an environmental assessment (“EA”) under the auspices of NEPA, 42 U.S.C. § 4321 et seq. The EA analyzed the effects the proposed casino would have on area wildlife, air and water; farming in the vicinity; and nearby communities. One of the issues addressed by the EA was the possibility that the casino would increase local traffic. The EA used the U.S. Department of Transportation (“DOT”) grading system to assess the severity of potential traffic delays: “Level Of Service A” means free passage, while “Level of Service F” means a driver can expect to wait eighty seconds or more before passing through an unsignaled intersection. The EA defined acceptable traffic delays to be “Level of Service C” or better. However, because Michigan does not grade intersections, the BIA concluded that approval by the Michigan Department of Transportation (“MDOT”) would also qualify an intersection’s traffic levels as acceptable.
Applying the DOT classification system, a study commissioned as part of the EA identified two local intersections where increased casino-related traffic would result in Level of Service F at certain times. These intersections sit at the junction of US-131, a limited access highway that runs north and south along the west edge of the Bradley property, and Michigan-179 (129th Avenue), a two-lane road that runs east and west along the south edge of the Bradley property. The study predicted that the casino would cause heavy traffic at the right turn from the northbound exit onto 129th Avenue (eastbound) and at the left turn from the southbound exit onto 129th Avenue (eastbound). Resulting delays would be particularly severe during afternoon rush hours.
To mitigate the traffic impact of the casino, the EA recommended construction of a new, dedicated right-turn lane for the northbound intersection and adding a four-way stop to the southbound intersection. It acknowledged the southbound left turn would still operate during peak periods at Level of Service F, so that a traffic light might be necessary. Although MDOT apparently will not commit to a traffic light based on predictions of traffic volume, it apparently would approve a dedicated right turn lane and a four-way stop.[1]
Having concluded that proposed measures would sufficiently alleviate traffic delays and that other potential problems identified in the EA would also be mitigated, the BIA and the NIGC both issued Findings of No Significant Impact (“FON-SI”) with respect to the casino project and announced their intent to acquire the Bradley property and allow the casino.
MichGO filed this lawsuit in June 2005, advancing four claims. The first alleged that the preparation of a FONSI rather than an environmental impact statement (“EIS”) violated NEPA. The second and third alleged violations of the Indian Gam *28 ing Regulatory Act (“IGRA”). The fourth alleged that the IRA is an unconstitutional delegation of authority to the Secretary of the Interior because there is no intelligible principle limiting its discretion on what land to acquire and hold in trust. The Tribe was allowed to intervene as a defendant. The district court granted summary judgment to the DOI on February 23, 2007. Mich. Gambling Opposition (Mi-chGO) v. Norton, 477 F.Supp.2d 1, 22 (D.D.C.2007). MichGO appeals and our review is de novo. Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C.Cir. 2006). However, in view of Citizens Exposing Truth About Casinos v. Kempthome, 492 F.3d 460 (D.C.Cir.2007), Mi-chGO does not pursue its IGRA claims. Appellant’s Reply Br. 2 n. 1.
II.
NEPA requires every agency proposing a “major Federal action” to prepare a statement of its environmental impact if the action will “significantly affeet[] the quality of the human environment.” 42 U.S.C. § 4332(C). Under regulations promulgated by the Council on Environmental Quality (“CEQ”) agencies must create procedures identifying “[s]pecific criteria for and identification of those typical classes of action” that require or do not require an EIS. 40 C.F.R. § 1507.3(b)(2). In considering any particular proposed action, an agency must first determine whether, under its own regulations, the proposal would “[njormally require! ] an [EIS]” or “[normally [would] not require either an [EIS] or an [EA].” Id. § 1501.4(a). If the proposed action is not covered by either of these descriptions, the agency should prepare an EA, and based on its conclusions, decide whether to prepare an EIS. Id. §§ 1501.4(b)-(c). The agency may con-elude that an EIS is not necessary and instead issue a FONSI, in which it must explain why there will be no significant impact. Id. §§ 1501.4(e); 1508.13.
A.
MiehGO contends that the Tribe’s casino is large and controversial, and that the DOI is thus required by law to prepare an EIS. To support this contention, Mi-ehGO relies on the 2005 “Checklist for Gaming Acquisitions,” distributed to regional directors by the BIA, which provides that “[proposals for large, and/or potentially controversial gaming establishments should require the preparation of an EIS.”[2] MiehGO maintains that 40 C.F.R. § 1501.4(a) requires an EIS to be performed if mandated by internal DOI guidelines such as the Checklist.
The premise underlying Mi-chGO’s contention is flawed. Section 1501.4(a) does not make the Checklist binding on the DOI. The CEQ does require each agency to “[d]etermine under its procedures” whether a project is of a type that normally requires an EIS. Id. § 1501.4(a). But it also specifies that these procedures will be established pursuant to section 1507.3. Id. Section 1507.3 sets out a specific process for developing the relevant agency procedures; as part of this process, the CEQ must approve the procedures before they are implemented. Id. § 1507.3(a). The DOI complied with these requirements when it established its NEPA procedures, now codified in its manual. Dep’t of the Interior, Department Manual, Pt. 516, Chpt. 10 (May 27, 2004). These procedures do not encompass the Checklist, which in any event does not appear to have been approved by the CEQ as required by section 1507.3(a). *29 The manual does, however, include lists of activities that under its procedures normally require or do not require an EIS or EA. Id. Gaming activities are not included in these lists. In these circumstances, the section 1501.4(b)-(c) process — EA preparation followed by a decision on whether to prepare an EIS — is applicable. The DOI followed these procedures and lawfully determined not to prepare an EIS on the basis of the EA.[3]
Because we are unpersuaded that the Checklist is binding on the DOI, we do not reach MichGO’s contention that the casino project at issue is “large” and “controversial” within the meaning of the Checklist.
B.
Alternatively, MichGO contends that it was arbitrary or capricious for the DOI to issue a FONSI without having prepared an EIS because two intersections would continue to experience Level of Service F at certain times, even after mitigation measures.[4]
A court reviews an agency’s FONSI or EIS under the Administrative Procedure Act, 5 U.S.C. § 706, and “cannot substitute [its] judgment for that of an agency if the agency’s decision was ‘fully informed and well considered.’ ” Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 684 (D.C.Cir.1982) (quoting Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). If the agency decided to issue a FONSI, it must either have concluded there would be no significant impact or have planned measures to mitigate such impacts. A court must review whether the agency:
(1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its EA, (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.
TOMAC v. Norton, 433 F.3d 852, 861 (D.C.Cir.2006) (internal quotations omitted).
The EA found that at least one intersection would experience Level of Service F at certain times even after mitigation measures. However, contrary to the assumption underlying MichGO’s contentions, the EA’s definition of acceptable traffic performance was not based solely on the level-of-service classification. Rather, the EA noted that local authorities had no standards for traffic intensity; thus the EA deployed two separate indicators as proof of acceptable traffic conditions: either Level of Service C or above or approval by relevant local authorities. MDOT, the agency with jurisdiction over these roads, found the traffic levels projected after the DOI’s mitigation measures *30 would be acceptable. It was not inherently arbitrary or capricious for the DOI to rely on MDOT’s assessment, cf. Coliseum Square Ass’n v. Jackson, 465 F.3d 215, 237 (5th Cir.2006), and MiehGO gives us no reason to question that reliance. The DOI was thus justified in finding that mitigation of the traffic impact was sufficient, and that an EIS was unnecessary.
III.
Article I of the Constitution provides that “[a]ll legislative Powers herein granted shall be vested in a Congress of the United States.” U.S. Const, art I, § 1. In considering a challenge to a delegation of power, “the test is whether Congress has set forth ‘an intelligible principle to which the person or body authorized to act is directed to conform.’” TOMAC, 433 F.3d at 866 (quoting Whitman v. Am. Trucking Ass’ns, 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (alterations and internal quotations omitted)). The Supreme Court has underscored that “the general policy and boundaries of a delegation ‘need not be tested in isolation’ ... [as] the statutory language may derive content from the ‘purpose of the Act, its factual background and the statutory context.’ ” Id. (quoting Am. Power & Light Co. v. SEC, 329 U.S. 90, 104, 67 S.Ct. 133, 91 L.Ed. 103 (1946)). Courts “have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.” Whitman, 531 U.S. at 474-75, 121 S.Ct. 903 (internal quotations omitted).
MiehGO contends that section 5 of the IRA is an unconstitutional delegation of legislative power because, apart from the DOI’s internal regulations, which cannot fill the void, it is “completely devoid of intelligible standards to guide or limit the Secretary’s discretion.” Appellant’s Br. at 35. We are not convinced. An agency cannot “cure an unconstitutionally standardless delegation of power by declining to exercise some of that power,” Whitman, 531 U.S. at 473, 121 S.Ct. 903, as the district court incorrectly suggested, MiehGO, 477 F.Supp.2d at 21-22. But giving due consideration to the purpose and factual background of the IRA and section 5’s statutory context, as the Supreme Court instructs, see Am. Power & Light Co., 329 U.S. at 104, 67 S.Ct. 133, and having due regard that “Congress is not confined to that method of executing its policy which involves the least possible delegation of discretion,” Yakus v. United States, 321 U.S. 414, 425-26, 64 S.Ct. 660, 88 L.Ed. 834 (1944), we conclude the statute provides an intelligible principle.[5]
Section 5 of the IRA authorizes the Secretary of the Interior to obtain land “for Indians.”[6] 25 U.S.C. § 465. This court *31 has not previously considered whether section 5 constitutes an unconstitutionally standardless delegation of power. But on its face, the delegation is no broader than other statutes, which the Supreme Court has upheld, that direct agencies to act in the “public interest,” Nat’l Broad. Co. v. United States, 319 U.S. 190, 216, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), or in a way that is “fair and equitable,” Yalcus, 321 U.S. at 420, 64 S.Ct. 660, see also Whitman, 531 U.S. at 473-75, 121 S.Ct. 903. Furthermore, the courts of appeals for the First, Eighth and Tenth Circuits have rejected challenges contending that section 5 is an unconstitutional delegation. See Carden v. Norton, 497 F.3d 15, 41-43 (1st Cir.2007) (en banc), cert. granted in part, denied on non-delegation issue,—U.S.-, 128 S.Ct. 1443, 170 L.Ed.2d 274 (2008); South Dakota v. U.S. Dep’t of Interior, 423 F.3d 790, 799 (8th Cir.2005); United States v. Roberts, 185 F.3d 1125, 1137 (10th Cir.1999). These courts have held “that an intelligible principle exists in the statutory phrase ‘for the purpose of providing land for Indians’ when it is viewed in the statutory and historical context of the IRA.” This principle involves “providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from ... prior [federal policy].” South Dakota, 423 F.3d at 799 (quoting 25 U.S.C. § 465); accord Carcieri, 497 F.3d at 42; Roberts, 185 F.3d at 1137.
Our review of the purpose and structure of the IRA confirms that, as our sister courts have held, and contrary to the view of our dissenting colleague, the statute provides an intelligible principle rather than a tautology when it authorizes the Secretary to acquire land “for the purpose of providing land for Indians”: the Secretary is to exercise his powers in order to further economic development and self-governance among the Tribes. Cf. Dissenting Op. at 37-38. The Supreme Court has noted that “[t]he intent and purpose of the [IRA] was to rehabilitate the Indian’s economic life and to give him a chance to develop the initiative destroyed by a century of oppression.” Mescalero Apache Tribe v. Jones, 411 U.S. 145, 152, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) (internal quotations omitted). This accords with the IRA’s stated purpose of “conserving] and developing] Indian lands and resources; ... extending] to Indians the right to form business and other organizations; ... establishing] a credit system for Indians; ... granting] certain rights of home rule to Indians; ... and [effectuating] other purposes.” Pub.L. No. 383, 48 Stat. 984, 984 (1934).
In addition to section 5, the IRA includes numerous other provisions addressing land use and economic development; among other things, these extend tribal trusts indefinitely, 25 U.S.C. § 462; restore lands previously declared “surplus” to those trusts, id. § 463; restrict land transfers from tribal reservations, id. § 464; and provide federal appropriations to support Indian economic development, id. § 470. This context underscores section 5’s role as part of a broad effort to promote economic development among American Indians, with a special emphasis on preventing and recouping losses of land caused by previous federal policies. The Supreme Court has acknowledged this emphasis, explaining that the IRA’s passage brought “an abrupt end” to the previous *32 federal “policy of allotment” that had led to individuals who were not American Indians acquiring “over two-thirds of the Indian lands allotted.” County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 255, 112 S.Ct. 688, 116 L.Ed.2d 687 (1992). The Court also emphasized that through the IRA Congress “[r]eturn[ed] to the principles of tribal self-determination and self-governance which had characterized” earlier federal policy. Id.
The standards revealed by examining the purpose and structure of the IRA are confirmed by reviewing the broader factual context of the statute. The IRA was enacted against a backdrop of great concern over economic and social challenges facing American Indians, and especially over the consequences of the federal government’s allotment policy, which had resulted in many tribal lands being distributed to individuals who then lost control of them, often because of fraud or inability to pay taxes. Royster, 27 Ajriz. St. L.J. at 12. By 1928, a report commissioned by the Secretary of the Interior found that the allotment policy had “destructive effects ... on the economic, social, cultural and physical well-being of the tribes.” Id. at 16. As both the Supreme Court, Mescalero Apache Tribe, 411 U.S. at 152, 98 S.Ct. 1267, and circuit courts, South Dakota, 423 F.3d at 798; Carcieri, 497 F.3d at 42, have acknowledged, the legislative history of the IRA also underscores its purpose of addressing economic and social challenges facing American Indians by promoting economic development. See H.R.Rep. No. 73-1804, at 6 (1934); S.Rep. No. 73-1080, at 1-2 (1934).[7]
There is nothing to suggest that section 5 is removed from the overall IRA purpose of advancing economic development among American Indians. While certain sections of the IRA include more specific language than section 5, see, e.g., 25 U.S.C. § 463, this does not detract from the overall purposes of the statute. Although, as our dissenting colleague suggests, particular’ clauses of the IRA could be interpreted as not advancing the goal of economic development, not alleviating all the problems caused by the allotment policy, or advancing goals more narrow than general economic development, Dissenting Op. at 36-37, this analysis ignores the unambiguous purpose of the IRA as a whole.
Finally, we note that the Supreme Court has observed that “the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred.” Whitman, 531 U.S. at 475, 121 S.Ct. 903. The scope of authority delegated to the Secretary under section 5 — to decide whether to grant sta *33 tus as “Indian Country” to specific plots of land owned by Indians or that is acquired for them — is not so broad as to require limiting principles more specific than pursuing Indian economic development. Our conclusion is underscored by examining-historical and contemporary context. The Executive has historically enjoyed extensive authority in conducting relations with American Indians, which has included negotiating treaties with Indian tribes and granting reservations to them by executive order. See, e.g., Handbook, supra, §§ 1.03; 15.04[4]; cf. Zemel v. Rusk, 381 U.S. 1, 17-18, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). “[E]ven in sweeping regulatory schemes ... statutes [are not required to] provide a determinate criterion” delimiting precisely how much of a good or harm an agency must address. Whitman, 531 U.S. at 475, 121 S.Ct. 903 (internal quotations omitted). Our dissenting colleague asserts that the Secretary’s powers under section 5 are vast, Dissenting Op. at 38-40, pointing to the many significant consequences that flow from the Secretary’s decision to accept land in trust for the Indians. But these consequences follow from section 5 and from other statutes, not from the decision of the Secretary to acquire land in trust, for section 5 gives the Secretary no power to regulate state taxing authority or anything else. Our dissenting colleague further faults Congress for not providing a narrower standard, but Congress must provide only an “intelligible” standard, Whitman, 531 U.S. at 474-75, 121 S.Ct. 903. That standard need not be utterly unambiguous, for it is settled that Congress may delegate interstitial lawmaking authority to executive agencies. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[8]
For these reasons, we join the First, Eighth and Tenth Circuits, Carcieri, 497 F.3d at 43; South Dakota, 423 F.3d at 799; Roberts, 185 F.3d at 1137, in upholding section 5 of the IRA. In cases entertaining (and rejecting) challenges asserting an unconstitutional delegation, the Supreme Court has “giv[en] narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional,” Mistretta v. United States, 488 U.S. 361, 373 n. 7, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), and has done so by looking at clauses that neighbor the delegation of power, e.g., Am. Power & Light Co., 329 U.S. at 104-05, 67 S.Ct. 133, as well as the statute’s overriding purpose, e.g., N.Y. Cent. Sec. Corp. v. United States, 287 U.S. 12, 24-25, 53 S.Ct. 45, 77 L.Ed. 138 (1932). Congress may legislate its goals explicitly, see, e.g., Mistretta, 488 U.S. at 374, 109 S.Ct. 647, but it need not do so. We thus hold, relying upon the text, structure, and purpose of the IRA, as well as the context of its enactment, that section 5 contains an intelligible principle and that it is not an unconstitutional delegation of legislative authority.
Accordingly, we affirm the grant of summary judgment.

. The EA relied on a September 25, 2001, letter from MDOT, which approved the dedicated right-turn lane; this letter did not expressly mention the four-way stop or any of the traffic study's conclusions. Letter from Robert Coy, Region Permit Agent, MDOT, to Marc Start, URS Corporation (Sept. 25, 2001). However, a letter from MDOT to the Tribe on February 12, 2002, cited the completed traffic study and approved its recommendations, which included the four-way stop. Letter from Robert Coy, Region Permit Agent, MDOT, to D.K. Sprague, Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, Gun Lake Tribe (Feb. 12, 2002).

. Office of Indian Gaming Mgmt., Dep't of the Interior, Checklist for Gaming Acquisitions Gaming-Related Acquisitions and IGRA Section 20 Determinations 10 (2005) ("Checklist”).

. MichGO's suggestion in its brief that the Checklist is binding independent of 40 C.F.R. § 1501.4 is not appropriately developed and thus not properly before the court. Schneider v. Kissinger, 412 F.3d 190, 200 n. 1 (D.C.Cir.2005). MichGO also maintains that ignoring non-binding regulations is arbitrary and capricious, but this contention is waived as it is raised only in the reply brief. Corson & Gruman Co. v. NLRB, 899 F.2d 47, 50 n. 4 (D.C.Cir.1990).

. MichGO maintains in a footnote of its initial brief and in its Reply Brief that increased traffic in the Village of Hopkins will constitute a significant, unmitigated impact. We do not consider this argument. ''[A]bsent extraordinary circumstances ... we do not entertain an argument raised for the first time in a reply brief ... or ... a footnote.” United States v. Whren, 111 F.3d 956, 958 (D.C.Cir. 1997).

. Hence the court has no occasion to address the Tribe's contention that the non-delegation doctrine is inapplicable because section 5 of the IRA does not involve a delegation of legislative power.

. Section 5 of the IRA provides in relevant part:
The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.
For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisition, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year____
*31 Title to any lands or rights acquired pursuant to this Act ... shall be taken in the name of the United States in trust for the Indian tribe ... for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.
25 U.S.C. § 465.

. The IRA's provisions constitute one chapter in a long and complicated history of interactions between the United States and American Indians. Our dissenting colleague asserts a trust relationship arises between the Indians and the United States only after the Government acquires land for the Indians, Dissenting Op. at 36, but this confuses the fiduciary relationship that arises because the United States is to hold newly-acquired land “in trust’’ under section 5 of the IRA, see Cobell v. Norton, 240 F.3d 1081, 1088 (D.C.Cir.2001); see also United States v. Wilson, 881 F.2d 596, 600 (9th Cir.1989), with the pre-existing “special relationship” that arose by virtue of the Government's historical relations with the Indians, see 1 Felix R. Cohen, Cohen's Handbook of Federal Indian Law § 5.04[4][a] (2005) (“Handbook”). That unique history informs our understanding of section 5 of the IRA; a statute authorizing the acquisition of land “for the purpose of providing land for Indians” is simply not the same as a statute authorizing the acquisition of land "for the purpose of providing land for persons taller than 6 feet.” See generally Reid P. Chambers, Judicial Enforcement of the Federal Trust Responsibility to Indians, 27 Stan. L.Rev. 1213 (1975).

. Nor are we concerned, for purposes of the non-delegation doctrine, that the Secretary’s decision to take land in trust might be unre-viewable in a court of law. Dissenting Op. at 37 (citing State of Fla., Dep't of Bus. Regulation v. U.S. Dep’t of Interior, 768 F.2d 1248 (11th Cir.1985)). Section 5 of the IRA intelligibly guides the Secretary's exercise of discretion, and that is all that the non-delegation doctrine requires. Yakus, 321 U.S. at 425-26, 64 S.Ct. 660; 5 U.S.C. § 701.