Justice Sotomayoe,
dissenting.
In enacting the Quiet Title Act (QTA or Act), Congress waived the Government’s sovereign immunity in cases seeking “to adjudicate a disputed title to real property in which the United States claims an interest.” 28 U. S. C. § 2409a(a). In so doing, Congress was careful to retain the Government’s sovereign immunity with respect to particular claimants, particular categories of land, and particular remedies. Congress and the Executive Branch considered these “carefully crafted provisions” essential to the immunity waiver and “necessary for the protection of the national public interest.” Block v. North Dakota ex rel. Board of Univ. and School Lands, 461 U. S. 273, 284-285 (1983).
The Court’s opinion sanctions an end-run around these vital limitations on the Government’s waiver of sovereign immunity. After today, any person may sue under the Administrative Procedure Act (APA) to divest the Federal Government of title to and possession of land held in trust for Indian tribes—relief expressly forbidden by the QTA—so long as the complaint does not assert a personal interest in the land. That outcome cannot be squared with the APA’s express admonition that it confers no “authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.” 5 U. S. C. § 702. The Court’s holding not only creates perverse incentives for private litigants, but also expose^ the Government’s *229 ownership of land to costly and prolonged challenges. Because I believe those results to be inconsistent with the QTA and the APA, I respectfully dissent.
I
A
Congress enacted the QTA to provide a comprehensive solution to the problem of real-property disputes between private parties and the United States. The QTA strikes a careful balance between private parties’ desire to adjudicate such disputes, and the Government’s desire to impose “‘appropriate safeguards’ ” on any waiver of sovereign immunity to ensure “ ‘the protection of the public interest.’ ” Block, 461 U. S., at 282-283; see also S. Rep. No. 92-575, p. 6 (1971).
Section 2409a(a) provides expansively that “[t]he United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest.” That language mirrors the title proposed by the Executive Branch for the legislation that Congress largely adopted: “A Bill To permit suits to adjudicate disputed titles to lands in which the United States claims an interest.” Id., at 7.
The remainder of the Act, however, imposes important conditions upon the Government’s waiver of sovereign immunity. First, the right to sue “does not apply to trust or restricted Indian lands.” § 2409a(a). The Indian lands exception reflects the view that “a waiver of immunity in this area would not be consistent with specific commitments [the Government] ha[s] made to the Indians through treaties and other agreements.'' Block, 461 U. S., at 283 (internal quotation marks omitted). By exempting Indian lands, Congress ensured that the Government’s “solemn obligations” to tribes would not be “abridged]... without the consent of the Indians.” S. Rep. No. 92-575, at 4.
Second, the Act preserves the United States’ power to retain possession or control of any disputed property, even if a *230 court determines that the Government’s property claim is invalid. To that end, § 2409a(b) “allow[s] the United States the option of paying money damages instead of surrendering the property if it lost a case on the merits.” Block, 461 U. S., at 283. This provision was considered essential to addressing the Government’s “main objection in the past to waiving sovereign immunity” where federal land was concerned: that an adverse judgment “would make possible decrees ousting the United States from possession and thus interfer[e] with operations of the Government.” S. Rep. No. 92-575, at 5-6. Section 2409a(b) “eliminate[d] cause for such apprehension” by ensuring that—even under the QTA—the United States could not be stripped of its possession or control of property without its consent. Id., at 6.
Finally, the Act limits the class of individuals permitted to sue the Government to those claiming a “right, title, or interest” in disputed property. § 2409a(d). As we have explained, Congress’ decision to restrict the class entitled to relief indicates that Congress precluded relief for the remainder. See, e. g., Block v. Community Nutrition Institute, 467 U. S. 340, 349 (1984) (“[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded”). That inference is especially strong here, because the QTA was “enacted against the backdrop of sovereign immunity.” S. Rep. No. 94-996, p. 27 (1976). Section 2409a(d) thus indicates that Congress concluded that those without any “right, title, or interest” in a given property did not have an interest sufficient to warrant abrogation of the Government’s sovereign immunity.
Congress considered these conditions indispensable to its immunity waiver.[1] “[W]hen Congress attaches conditions to *231 legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied.” Block, 461 U. S., at 287. Congress and the Executive Branch intended the scheme to be the exclusive procedure for resolving property title disputes involving the United States. See id., at 285 (describing Act as a “‘careful and thorough remedial scheme’ ”); S. Rep. No. 92-575, at 4 (Section 2409a “provides a complete, thoughtful approach to the problem of disputed titles to federally claimed land” (emphasis added)).
For that reason, we held that Congress did not intend to create a “new supplemental remedy” when it enacted the APA’s general waiver of sovereign immunity. Block, 461 U. S., at 286, n. 22. “ ‘It would require the suspension of disbelief,’ ” we reasoned, “ ‘to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading.’ ” Id., at 285 (quoting Brown v. GSA, 425 U. S. 820, 833 (1976)). If a plaintiff could oust the Government of title to land by means of an APA action, “all of the carefully crafted provisions of the QTA deemed necessary for the protection of the national public interest could be averted,” and the “Indian lands exception to the QTA would be rendered nugatory.” Block, 461 U. S., at 284-285. We therefore had little difficulty concluding that Congress did not intend to render the QTA’s limitations obsolete by affording any plaintiff the right to dispute the Government’s title to any lands by way of an APA action—and to empower any such plaintiff to “disposses[s] [the United States] of the disputed property without being afforded the option of paying damages.” Id., at 285.
*232 It is undisputed that Patchak does not meet the conditions to sue under the QTA. He seeks to challenge the Government’s title to Indian trust land (strike one); he seeks to force the Government to relinquish possession and title outright, leaving it no alternative to pay compensation (strike two); and he does not claim any personal right, title, or interest in the property (strike three). Thus, by its express terms, the QTA forbids the relief Patchak seeks. Compare ante, at 214 (“[A]ll parties agree that the suit now effectively seeks to divest the Federal Government of title to the [Indian trust] land”), with United States v. Mottaz, 476 U. S. 834, 842 (1986) (Section 2409a(a)’s Indian lands exclusion “operates solely to retain the United States’ immunity from suit by third parties challenging the United States’ title to land held in trust for Indians”). Consequently, Patchak may not avoid the QTA’s constraints by suing under the APA, a statute enacted only four years later. See 5 U. S. C. § 702 (rendering the APA’s waiver of sovereign immunity inapplicable “if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought”).
B
The majority nonetheless permits Patchak to circumvent the QTA’s limitations by filing an action under the APA. It primarily argues that the careful limitations Congress imposed upon the QTA’s waiver of sovereign immunity are “simply inapposite” to actions in which the plaintiff advances a different “grievance” to that underlying a QTA suit, i. e., cases in which a plaintiff seeks to “strip the United States of title to the land . . . not on the ground that it is his,” but rather because “the Secretary’s decision to take land into trust violates a federal statute.” Ante, at 217, 220. This analysis is unmoored from the text of the APA.
Section 702 focuses not on a plaintiff’s motivation for suit, nor the arguments on which he grounds his case, but only on whether another statute expressly or impliedly forbids the *233 relief he seeks. The relief Patchak admittedly seeks—to oust the Government of title to Indian trust land—is identical to that forbidden by the QTA. Conversely, the Court’s hypothetical suit, alleging that the Bradley Property was causing environmental harm, would not be barred by the QTA. See ante, at 216. That is not because such an action asserts a different “grievance,” but because it seeks different relief—abatement of a nuisance rather than the extinguishment of title.[2]
In any event, the “grievance” Patchak asserts is no different from that asserted in Block—a ease in which we unanimously rejected a plaintiff’s attempt to avoid the QTA’s restrictions by way of an APA action or the similar device of an officer’s suit.[3] That action, like this one, was styled as a suit claiming that the Government’s actions respecting land were “‘“not within [its] statutory powers.”’” 461 U. S., at 281. Cf. ante, at 220 (“[Patchak] asserts merely that the Secretary’s decision to take land into trust violates a federal statute”). The relief requested was also identical to that sought here: injunctive relief directing the United States to *234 “ ‘cease and desist from . . . exercising privileges of ownership’ ” over the land in question. 461 U. S., at 278; see also App. 38.
The only difference that the majority can point to between Block and these cases is that Patchak asserts a weaker interest in the disputed property. But that is no reason to imagine that Congress intended a different outcome. As the majority itself acknowledges, the harm to the United States and tribes when a plaintiff sues to extinguish the Government’s title to Indian trust land is identical “whether or not a plaintiff claims to own the land himself.” Ante, at 223. Yet, if the majority is correct, Congress intended the APA’s waiver of immunity to apply to those hypothetical plaintiffs differently. Congress, it suggests, intended to permit anyone to circumvent the QTA’s careful limitations and sue to force the Government to relinquish Indian trust lands—anyone, that is, except those with the strongest entitlement to bring such actions: those claiming a personal “right, title, or interest” in the land in question. The majority’s conclusion hinges, therefore, on the doubtful premise that Congress intended to waive the Government’s sovereign immunity wholesale for those like Patchak, who assert an “aesthetic” interest in land, ante, at 212, while retaining the Government’s sovereign immunity against those who assert a constitutional interest in land—the deprivation of property without due process of law. This is highly implausible. Unsurprisingly, the majority does not even attempt to explain why Congress would have intended this counterintuitive result.
It is no answer to say that the QTA reaches no further than an “ordinary quiet title suit.” Ante, at 221. The action permitted by § 2409a is not an ordinary quiet title suit. At common law, equity courts “permitted] a bill to quiet title to be filed only by a party in possession [of land] against a defendant, who ha[d] been ineffectually seeking to establish a legal title by repeated actions of ejectment.” Wehrman v. Conklin, 155 U. S. 314, 321-322 (1894) (emphasis added). *235 Section 2409a is broader, requiring neither prerequisite. Moreover, as the majority tells us, see ante, at 217, an act to quiet title is “universally understood” as a proceeding “to establish a plaintiff’s title to land,” Black’s Law Dictionary 34 (9th ed. 2009) (emphasis added). But § 2409a authorizes civil actions in cases in which neither the Government, nor the plaintiff, claims title to the land at issue. See § 2409a(d) (“The complaint shall set forth ... the right, title, or interest which the plaintiff claims” (emphasis added)).[4] A plaintiff may file suit under § 2409a, for instance, when he claims only an easement in land, the right to explore an area for minerals, or some other lesser right or interest. See S. Rep. No. 92-575, at 5. Notwithstanding its colloquial title, therefore, the QTA plainly allows suit in circumstances well beyond “bread-and-butter quiet title actions,” ante, at 219, n. 5.[5]
The majority attempts to bolster its reading by emphasizing an unexpected source within § 2409a: the clause specifying that the United States may be sued “ ‘in a civil action under this section.'” Ante, at 221. The majority understands this clause to narrow the QTA’s scope (and its limitations on the Government’s immunity waiver) to quiet title claims only. But “this section” speaks broadly to civil actions “to adjudicate a disputed title to real property in which the United States claims an interest.” § 2409a. Moreover, *236 this clause is read most straightforwardly to serve a far more pedestrian purpose: simply to state that a claimant can file “a civil action under this section”—§ 2409a—to adjudicate a disputed title in which the United States claims an interest. Regardless of how one reads the clause, however, it does not alter the APA’s clear command that suits seeking relief forbidden by other statutes are not authorized by the APA. And the QTA forbids the relief sought here: injunctive relief forcing the Government to relinquish title to Indian lands.
Even if the majority were correct that the QTA itself reached only as far as ordinary quiet title actions, that would establish only that the QTA does not expressly forbid the relief Patchak seeks. The APA, however, does not waive the Government’s sovereign immunity where any other statute “expressly or impliedly forbids the relief which is sought.” 5 U. S. C. § 702 (emphasis added). The text and history of the QTA, as well as this Court’s precedent, make clear that the United States intended to retain its sovereign immunity from suits to dispossess the Government of Indian trust land. Patchak’s suit to oust the Government of such land is therefore, at minimum, impliedly forbidden.[6]
II
Three consequences illustrate the difficulties today’s holding will present for courts and the Government. First, it will render the QTA’s limitations easily circumvented. Although those with property claims will remain formally prohibited from bringing APA suits because of Block, savvy plaintiffs and their lawyers can recruit a family member or neighbor to bring suit asserting only an “aesthetic” interest in the land but seeking an identical practical objective—to divest the Government of title and possession. §§ 2409a(a), (b). Nothing will prevent them from obtaining relief that the QTA was designed to foreclose.
*237 Second, the majority’s holding will frustrate the Government’s ability to resolve challenges to its fee-to-trust decisions expeditiously. When a plaintiff like Patchak asserts an “aesthetic” or “environmental” concern with a planned use of Indian trust land, he may bring a distinct suit under statutes like the National Environmental Policy Act of 1969 and the Indian Gaming Regulatory Act. Those challenges generally may be brought within the APA’s ordinary 6-year statute of limitations. Suits to contest the Government’s decision to take title to land in trust for Indian tribes, however, have been governed by a different rule. Until today, parties seeking to challenge such decisions had only a 30-day window to seek judicial review. 25 CFR § 151.12 (2011); 61 Fed. Reg. 18082-18083 (1996). That deadline promoted finality and security—necessary preconditions for the investment and “economic development” that are central goals of the Indian Reorganization Act. Ante, at 226.[7] Today’s result will promote the opposite, retarding tribes’ ability to develop land until the APA’s 6-year statute of limitations has lapsed.[8]
Finally, the majority’s rule creates substantial uncertainty regarding who exactly is barred from bringing APA claims. The majority leaves unclear, for instance, whether its rule bars from suit only those who “claim any competing interest” in the disputed land in their complaint, ante, at 217, or those who could claim a competing interest, but plead only that the *238 Government’s title claim violates a federal statute. If the former, the majority’s holding would allow Patchak’s challenge to go forward even if he had some personal interest in the Bradley Property, so long as his complaint did not assert it. That result is difficult to square with Block and Mottaz. If the latter, matters are even more peculiar. Because a shrewd plaintiff will avoid referencing her own property claim in her complaint, the Government may assert sovereign immunity only if its detective efforts uncover the plaintiff’s unstated property claim. Not only does that impose a substantial burden on the Government, but it creates perverse incentives for private litigants. What if a plaintiff has a weak claim, or a claim that she does not know about? Did Congress really intend for the availability of APA relief to turn on whether a plaintiff does a better job of overlooking or suppressing her own property interest than the Government does of sleuthing it out?
As these observations illustrate, the majority’s rule will impose a substantial burden on the Government and leave an array of uncertainties. Moreover, it will open to suit lands that Congress and the Executive Branch thought the “national public interest” demanded should remain immune from challenge. Congress did not intend either result.
* * *
For the foregoing reasons, I would hold that the QTA bars the relief Patchak seeks. I respectfully dissent.

 As we explained in Block v. North Dakota ex rel. Board of Univ. and School Lands, 461 U. S. 273, 282-283 (1983), Congress’ initial proposal lacked such provisions. The Executive Branch, however, strongly opposed the original bill, explaining that it was “too broad and sweeping *231 in scope and lacking adequate safeguards to protect the public interest.” Dispute of Titles on Public Lands: Hearings on S. 216 et al. before the Subcommittee on Public Lands of the Senate Committee on Interior and Insular Affairs, 92d Cong., 1st Sess., 21 (1971). Congress ultimately agreed, largely adopting the Executive’s substitute bill. See Block, 461 U. S., at 283-284.

 The majority claims, ante, at 217, n. 3, that this test has “no obvious limits,” but it merely applies the text of § 702 (which speaks of “relief,” not “grievances”). In any event, the majority’s hypothetical, ibid., compares apples to oranges. I do not contend that the APA bars all injunctive relief involving Indian lands, simply other suits—like this one—that seek “to adjudicate a disputed title to real property in which the United States claims an interest.” 28 U. S. C. § 2409a(a). That result is entirely consistent with Block—which stated that the APA “specifically confers no ‘authority to grant relief if any other statute . . . expressly or impliedly forbids the relief which is sought.’ ” 461 U. S., at 286, n. 22 (quoting 5 U.S. C. § 702).

 An officer’s suit is an action directly against a federal officer, but was otherwise identical to the kind of APA action at issue here. Compare Block, 461 U. S., at 281 (seeking relief because agency official’s actions were “ ‘ “not within [his] statutory powers” ’ ”), with 5 U. S. C. § 706(2)(C) (“The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be ... in excess of statutory jurisdiction, authority, or limitations”).

 The majority notes that some States permit a broader class of claims under the rubric of “quiet title,” and points to the “ Vide differences in State statutory and decisional law’ on quiet title suits” at the time of the Act. Ante, at 218, n. 4. But that substantial variation only illustrates the artificiality of the majority’s claim that the Act only “addresses quiet title actions, as ordinarily conceived.” Ante, at 219, n. 5 (emphasis added).

 I recognize, of course, that the QTA is titled “[a]n Act [t]o permit suits to adjudicate certain real property quiet title actions.” 86 Stat. 1176. But “the title of a statute ... cannot limit the plain meaning of [its] text.” Trainmen v. Baltimore & Ohio R. Co., 331 U. S. 519, 528-529 (1947). As explained above, the substance of Congress’ enactment plainly extends more broadly than quiet title actions, mirroring the scope of the title proposed by the Government. See supra, at 229.

 Because I conclude that sovereign immunity bars Patchak’s suit, I would not reach the question whether he has standing.

 Trust status, for instance, is a prerequisite to making lands eligible for various federal incentives and tax credits closely tied to economic development. See, e. g., App. 56. Delayed suits will also inhibit tribes from investing in uses other than gaming that might be less objectionable—like farming or office use.

 Despite notice of the Government’s intent through an organization with which he was affiliated, Patchak did not challenge the Government’s fee-to-trust decision even though the organization did. See Michigan Gambling Opposition v. Kempthorne, 525 F. 3d 23 (CADC 2008). Instead, Patchak waited to sue until three years after the Secretary’s intent to acquire the property was published. App. 35, 39.