# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 18, 2016                     Decided July 29, 2016

No. 14-5326

CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY
OF OREGON,
APPELLANT

v.

SALLY JEWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF
THE UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

———

Consolidated with 15-5033

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cv-00849)

———

*Lawrence Robbins* argued the cause for appellants
Confederated Tribes of the Grand Ronde Community of
Oregon. With him on the briefs were *Gary A. Orseck*, and
*Daniel N. Lerman*.

*Benjamin S. Sharp* argued the cause for appellants Clark
County, Washington, et al. With him on the briefs were
*Jennifer A. MacLean*, *Donald C. Baur*, *Eric D. Miller*, *Brent
D. Boger*, and *Christine M. Cook*.

*John L. Smeltzer*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *John C. Cruden*, Assistant Attorney General, and *Elizabeth Ann Peterson*, Attorney.

*Robert D. Luskin* argued the cause for intervenor-appellee the Cowlitz Indian Tribe. With him on the brief were *V. Heather Sibbison*, *Suzanne R. Schaeffer*, and *Kenneth J. Pfaehler*.

*Craig J. Dorsay* was on the brief for *amicus curiae* Samish Indian Nation in support of federal appellee Sally Jewell, Secretary of the United States Department of the Interior, and intervenor-appellee Cowlitz Indian Tribe.

*Elliott A. Milhollin*, *Gregory A. Smith*, and *Geoffrey D. Strommer* were on the brief for *amici curiae* United South and Eastern Tribes, Inc. and Jamestown S'Klallam Tribe in support of intervenor-appellee.

Before: PILLARD and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

WILKINS, *Circuit Judge*: The Cowlitz are an American Indian tribe from southwestern Washington state. After refusing to sign a land cession treaty with the United States in 1855, President Lincoln by 1863 proclamation opened its land to non-Indian settlement. Without a land base, the Cowlitz scattered, and for decades federal Indian policy reflected a mistaken belief that they no longer existed as a distinct communal entity. After a formal process for federal acknowledgment came into being in 1978, the Cowlitz at last gained legal status as a tribe in the eyes of the government in 2002. Reconsidered Final Determination for Federal

Acknowledgment of the Cowlitz Indian Tribe, 67 Fed. Reg. 607 (Jan. 4, 2002). Immediately thereafter, they successfully petitioned the Department of the Interior to take into trust and declare as their "initial reservation" a parcel of land. The Cowlitz wish to use this parcel for tribal government facilities, elder housing, a cultural center, as well as a casino.

Two groups of Plaintiff-Appellants bring challenges under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, to the Interior Secretary's decision to take the land into trust and to allow casino-style gaming. One group[1] is comprised of Clark County, Washington, homeowners and community members in the area surrounding the parcel, as well as competing gambling clubs and card rooms (collectively, "Clark County"). Another is the Confederated Tribes of the Grand Ronde Community of Oregon ("Grand Ronde"), which owns and operates a competing casino. The District Court consolidated the actions, allowed the Cowlitz to intervene and, in reviewing cross-motions for summary judgment, ruled in favor of the Secretary and the Cowlitz. *See Confederated Tribes of the Grand Ronde Cmty. v. Jewell*, 75 F. Supp. 3d 387 (D.D.C. 2014).

For the reasons that follow, we affirm the judgment of the District Court. The Secretary reasonably interpreted and applied the Indian Reorganization Act ("IRA"), 25 U.S.C. § 461 *et seq.*, to conclude that the Cowlitz are a "recognized Indian tribe now under Federal jurisdiction," 25 U.S.C. § 479. The Secretary also reasonably determined that the Cowlitz meet the "initial-reservation" exception to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.* Lastly,

---

[1] The City of Vancouver, Washington, was voluntarily dismissed from the case following oral argument.

we reject Appellants' remaining claims of error under the IRA, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and 25 C.F.R. § 83.12(b) (1994), based on the Secretary's alleged failure independently to verify the Tribe's business plan and membership figures.

**I.**

The 1934 IRA was meant "to promote economic development among American Indians, with a special emphasis on preventing and recouping losses of land caused by previous federal policies." *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 31 (D.C. Cir. 2008). Whereas a prior policy of allotment sought "to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large," *Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 254 (1992), Congress enacted the IRA, among other things, to "conserve and develop Indian lands and resources," Pub. L. No. 383, 48 Stat. 984, 984 (1934). As part of this effort, the statute permits the Secretary of the Interior to accept lands into federal trust for "Indians." 25 U.S.C. § 465.

There are three ways to qualify as an "Indian" under the IRA, which extends to:

> [1] [A]ll persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction . . .

> [2] [A]ll persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and . . .

> [3]  [A]ll other persons of one-half or more
> Indian blood.

25 U.S.C. § 479.  In *Carcieri v. Salazar*, the Supreme Court held that the word, "now," unambiguously limits the first definition to members of those tribes that were under federal jurisdiction in the year 1934.   555 U.S. 379, 391 (2009).  In so holding, it did not pass on the exact meaning of "recognized" or "under Federal jurisdiction."   These two terms are at the heart of our case.

Appellants challenge whether the Cowlitz qualify as "Indians" under the IRA because another statute – the IGRA – permits gaming on land that the Secretary takes into trust on behalf of Indians pursuant to the IRA.  25 U.S.C. § 2719.  For lands acquired after October 17, 1988, there is a blanket prohibition on IGRA-regulated gaming, *id.* § 2719(a), unless the land meets certain statutory criteria,  *id.* § 2719(b). Pertinent to our case,  the IGRA contains an exception for land acquired as part of "the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process" – the so-called "initial-reservation" exception.  *Id.* § 2719(b)(1)(B)(ii).  Another exception – for so-called "restored lands" – applies where land has been acquired as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition."  *Id.* § 2719(b)(1)(B)(iii).  These exceptions "ensur[e] that tribes lacking reservations when [the] IGRA was enacted are not disadvantaged relative to more established ones."  *City of Roseville v. Norton*, 348 F.3d 1020, 1030 (D.C. Cir. 2003). For the whole point of the IGRA is to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  *Diamond Game Enters. v.*

*Reno*, 230 F.3d 365, 366-67 (D.C. Cir. 2000) (quoting 25 U.S.C. § 2702(1)).

After an Indian Claims Commission ("ICC")[2] decision concluded that the federal government had "deprived the Cowlitz Tribe of its aboriginal title as of March 20, 1863, without the payment of any consideration therefor,"[3] 25 Ind. Cl. Comm. 442, 463 (June 23, 1971), it was not until years later in 2002 that the Tribe gained federal acknowledgment.[4] Final Determination to Acknowledge the Cowlitz Indian Tribe, 65 Fed. Reg. 8,436 (Feb. 18, 2000); 67 Fed. Reg. at 607. The federal acknowledgment process requires an applicant group to show, *inter alia*, that it has existed as a distinct community since 1900. *See* 25 C.F.R. § 83.11(b). The acknowledgment conferred on the Cowlitz legal status as an Indian tribe, thereby qualifying them for the protection, services, and benefits afforded by the federal government to Indian tribes. FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 134 (2012 ed.) [hereinafter Cohen].

The same day the Cowlitz gained federal acknowledgment, they submitted an application to Interior

---

[2] The ICC no longer exists but was a special tribunal created to try pre-1946 Indian claims against the federal government. *Six Nations Confederacy v. Andrus*, 610 F.2d 996, 997 (D.C. Cir. 1979).

[3] In 1973, the ICC entered judgment in favor of the Cowlitz for $1,550,000. 30 Ind. Cl. Comm. 129, 143 (April 12, 1973).

[4] Following an administrative appeal and remand, in December 2001, the Assistant Secretary for Indian Affairs issued a Reconsidered Final Determination affirming the earlier one. J.A. 1143. The Reconsideration was published in the Federal Register on, and federal acknowledgment was effective as of, January 4, 2002. 67 Fed. Reg. 607 (Jan. 4, 2002).

requesting that it accept into trust and declare a 151.87-acre parcel of land their "initial reservation." The parcel is located in Clark County, Washington, closest to the town of La Center, and is approximately 24 miles from the Tribe's headquarters in Longview, Washington, 30 minutes from Portland, Oregon, and 20 minutes from Vancouver, Washington. Grand Ronde's casino, in comparison, is located approximately 65 miles from Portland. The parties dispute the Cowlitz's historical connections to the parcel, but at least agree that it is 14 miles south of Cowlitz aboriginal territory, where the tribe exercised exclusive use and occupancy.

As part of the tribal gaming approval process, while the initial-reservation request and land-into-trust petition were pending with Interior, the National Indian Gaming Commission ("NIGC")[5] issued a 2005 Opinion suggesting that the parcel also could qualify for the IGRA's restored-lands exception.[6] The Bureau of Indian Affairs next prepared a draft environmental impact statement ("DEIS") and final environmental impact statement ("FEIS") in 2006 and 2008, respectively. *See* 42 U.S.C. § 4332(C) (requiring a detailed environmental impact statement for "major Federal actions significantly affecting the quality of the human environment"). In 2010, the Secretary initially approved the

---

[5] Congress created the NIGC, an independent regulatory commission located within the Interior Department, to implement the IGRA. *See Diamond Game Enters.*, 230 F.3d at 367; Cohen at 876 n.5.

[6] The tribe noted that it was effectively asking to qualify for both exceptions – one through the Secretary and one through the NIGC. At the time there was no prohibition on qualifying for both exceptions at the same time, but that changed in 2008. *See Confederated Tribes*, 75 F. Supp. 3d at 395 n.3 (citing 25 C.F.R. § 292.6 (2008)); 25 C.F.R. § 292.11(b)(2) (2008).

land-trust application, and declared the land to be the initial reservation of the Cowlitz. Following a separate APA challenge and remand, Interior issued a revised record of decision ("ROD") in April 2013 that, among other things, confirmed its initial reservation decision.

Grand Ronde and Clark County each challenged the final ROD in June 2013. They alleged: 1) that the Cowlitz were neither "recognized" nor "under federal jurisdiction" in 1934, and therefore cannot be the beneficiary of a trust acquisition under the IRA; 2) that the Tribe lacks sufficient historic connections to the parcel to meet the regulatory requirements for the IGRA's initial-reservation exception; and 3) that the FEIS failed, in various ways, to satisfy the requirements of the National Environmental Policy Act. Clark County additionally claimed that the Secretary lacked authority to take the land into trust because it allegedly shirked a responsibility under 25 C.F.R. § 83.12(b) (1994) regarding additions to a tribe's membership roll after federal acknowledgment.

The District Court consolidated the actions, allowed the Cowlitz to intervene as a defendant, and granted summary judgment for Interior and the Cowlitz. This appeal timely followed.

## II.

We review the District Court's grant of summary judgment *de novo*. *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006). We will not uphold an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E).

When it comes to an agency's interpretation of a statute Congress has authorized it to implement, we employ the familiar *Chevron* analysis. *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 465 (D.C. Cir. 2007) (citing *Chevron v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). If Congress has directly spoken to the issue, that is the end of the matter. *Id.* (citing *Chevron*, 467 U.S. at 842-43). Otherwise, in cases of implicit legislative delegation, we must determine if the agency's interpretation is permissible, and if so, defer to it. *Id*; *Chevron*, 467 U.S. at 843-44. We do so while mindful of the "governing canon of construction requir[ing] that statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *California Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008) (quoting *Cobell v. Norton*, 240 F.3d 1081, 1101 (D. C. Cir. 2001)). Of course, agency action is always subject to arbitrary and capricious review under the APA, even when it survives *Chevron* Step Two – an inquiry that in our case overlaps. *See Judulang v. Holder*, 132 S. Ct. 476, 483 n.7 (2011); *see also* EDWARDS ET AL., FEDERAL STANDARDS OF REVIEW 217-220 (2d ed. 2013). Finally, we give substantial deference to an agency's interpretation of its own regulations unless it is contrary to the regulation's plain language. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

## A.

The Secretary's authority to take land into trust is limited, in pertinent part, to doing so on behalf of "any recognized Indian tribe now under Federal jurisdiction." 25 U.S.C. § 479. Appellants challenge the Secretary's decision with respect to both what it means to be "recognized" and to be

"under Federal jurisdiction." We first tackle the meaning of "recognized."

**1.**

The Secretary determined that the Cowlitz's federal acknowledgment in 2002 satisfied the statute's recognition requirement. The Secretary began by explaining that, although "now under Federal jurisdiction" refers to when the IRA was enacted, "now" is cabined to that Federal-jurisdiction requirement and does not modify "recognized." Citing Justice Breyer's approach from his concurrence in *Carcieri*, the ROD explained that "[t]he IRA imposes no time limit upon recognition," J.A. 255 (quoting 555 U.S. at 398 (Breyer, J., concurring)), and "the tribe need only be 'recognized' as of the time the Department acquires the land into trust," J.A. 255. Thus, there was no need to further delineate the precise contours of the term, which the Secretary acknowledged carries much historical baggage. The concept of "recognition" has been used at once in the cognitive or quasi-anthropological sense, in terms of knowing or realizing that a tribe exists, and alternatively in a political sense, to refer to a formalized, unique relationship between a tribe and the United States. Rather than parse the range of interactions with the government qualifying as recognition, the Secretary concluded that under any definition, the Cowlitz's 2002 acknowledgment through the administrative federal acknowledgment process was sufficient. J.A. 254-55.

According to Appellants, the Secretary's interpretation was error because the IRA mandates that a tribe must have been recognized in the year 1934. When it comes to the meaning of recognition, they furthermore believe the IRA uses that term in the political sense. Appellants advocate that there must have been some "formal political act confirming

the tribe's existence as a distinct political society" back in in 1934, which, they maintain, the Cowlitz cannot show.  Grand Ronde Br. 19 (citing *California Valley Miwok*, 515 F.3d at 1263).

**2.**

We first confront whether Congress has directly spoken to the issue, an inquiry we undertake using traditional tools of statutory interpretation, and decide it has not.  *Chevron*, 467 U.S. at 842 n.9; *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 297 (D.C. Cir. 2003).

Before moving to *Chevron* Step One, though, we pause to confirm that the *Chevron* framework is in fact applicable. Clark County suggests that the Supreme Court already foreclosed any role by Interior to interpret the first definition of Indian in the IRA.  Clark County Br. 9-10 (citing *Carcieri*, 555 U.S. at 391).  That is too broad a reading of *Carcieri*, whose holding reaches only the temporal limits of the Federal-jurisdiction prong.  555 U.S. at 395. ("We hold that the term 'now under Federal jurisdiction' in § 479 unambiguously refers to those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934.").  When the Court in another passage wrote that there was "no gap in 25 U.S.C. § 479 for the agency to fill," *Carcieri*, 555 U.S. at 391, it was rejecting a government argument that the IRA's three definitions of "Indian" were "illustrative rather than exclusive," Brief for Respondents at 26, *Carcieri v. Salazar*, 555 U.S. 379 (2009) (No. 07-526). The Court disagreed that the statute's phrasing somehow empowered Interior to create additional categories of Indians. *See Carcieri*, 555 U.S. at 391 (citing Brief for Respondents at 26-27).  That sentence does not mean, however, that the IRA is wholly immune to a *Chevron* analysis.

We thus turn to the text of the statute, which defines "Indian" as:

> [1]  [A]ll persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction . . .

> [2]  [A]ll persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and . . .

> [3]  [A]ll other persons of one-half or more Indian blood.

25 U.S.C. § 479. When considering the larger phrase, "recognized Indian Tribe now under Federal jurisdiction," the word, "now" is an adverb, and adverbs modify verbs, adjectives or other adverbs. MICHAEL STRUMPF & AURIEL DOGULAS, THE GRAMMAR BIBLE 112 (2004). Adverbs typically precede the adjectives and adverbs they seek to modify, which strongly signals that "now" is limited to the prepositional phrase, "now under Federal jurisdiction." *See id.* at 121. The placement of "now" in reference to "under Federal jurisdiction" is only half the answer, however. The more difficult question is whether that temporally limited prepositional phrase, "now under Federal jurisdiction," modifies the noun, "tribe," before its modification by the adjective, "recognized," or whether it modifies the already modified noun, "recognized tribe." If "now under Federal jurisdiction" only modifies "tribe," there is no temporal limitation on when recognition must occur. If the prepositional phrase instead modifies "recognized tribe," recognition must have already happened as of 1934. *See Carcieri*, 555 U.S. at 391.

Understood in this way, we agree with the District Court that "recognized" is ambiguous and susceptible to either interpretation. While Appellants disagree, Grand Ronde offers a grammatical hypothetical that only confirms this ambiguity. When considering a statute giving benefits to "any certified veteran wounded in 1934," Grand Ronde Br. 12, that phrase might very well refer to a universe of veterans wounded in 1934, but thereafter certified, *Confederated Tribes*, 75 F. Supp. 3d at 399. Like in our situation, "wounded in 1934" modifies the noun, "veteran." But "veteran" is also modified by "certified," and it is unclear from the sentence's structure when the certification must occur. Grande Ronde's own example shows that Appellants' construction "is not an inevitable one." *Regions Hosp. v. Shalala*, 522 U.S. 448, 460 (1998); *see also id.* at 458 ("[T]he phrase 'recognized as reasonable' might mean costs the Secretary . . . *has* recognized as reasonable . . . or *will* recognize as reasonable").

The structure of the IRA does not counsel otherwise. Appellants contend that the IRA's second definition of "Indian" erases any ambiguity in the first definition and does not make sense unless we understand the statute to require recognition in 1934. The second definition refers to "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation." 25 U.S.C. § 479. Appellants do not believe a descendant of a tribe recognized in 2002 could have lived on a reservation in 1934. That assumption is incorrect, for, as the government explains, recognition that occurs after 1934 "simply means, in retrospect, that any descendant of a Cowlitz Tribal member who was living on an Indian reservation in 1934 then met the IRA's second definition." Gov't Br. 47. As a concrete example, the District Court pointed to Cowlitz members who lived on the reservation of

the Quinault Tribe in 1934. *Confederated Tribes*, 75 F. Supp. 3d at 400. Thus, the IRA's second definition does not overcome the ambiguity we see in the first definition.

We move on to legislative history, which similarly does not provide any clarity on when recognition must occur or what it entails. The Senate Committee on Indian Affairs discussed how to define "Indian" throughout April and May of 1934, and did so in contradictory ways. One exchange between Senator Elmer Thomas and Commissioner of Indian Affairs John Collier suggested the IRA was being crafted expansively, to "throw[] open Government aid to those rejected Indians." *To Grant to Indians Living Under Federal Tutelage the Freedom to Organize for Purposes of Local Self-Government and Economic Enterprises: Hearing on S. 2755 and S. 3645 Before the S. Comm. on Indian Affairs*, 73 Cong. 80 (1934) [hereinafter Subcommittee Hearing]. Other Senators expressed concern about whether individuals might evade the blood quantum requirement in the third definition of Indian, covering persons of one-half or more Indian blood, 25 U.S.C. § 479, if they could show they were "members of any recognized Indian tribe," Subcommittee Hearing at 266. To cabin eligibility, Chairman Wheeler said, "You would have to have a limitation after the description of the tribe," after which Collier suggested inserting "now under Federal jurisdiction," after "recognized Indian tribe." Subcommittee Hearing at 266. The hearing then abruptly ended, leaving only so much to glean from these words – certainly nothing about when recognition must occur. At most, this history reflects Congressional intent to limit what was a much broader concept of recognition by some "jurisdictional" connection to the government, even though, as discussed later, nobody seemed to know what that jurisdictional connection might be. While not telling us anything about any time limitation on recognition, the legislative history at least

counters Appellants' contention that "recognized Indian tribe" was some established term of art unambiguously referring to a tribe's political status.

**3.**

Proceeding to *Chevron* Step Two, we note that Appellants raise claims under both *Chevron* and *State Farm*, which in this case overlap. *See* EDWARDS, *supra*, at 217 ("In [some] situations, what is 'permissible' under *Chevron* is also reasonable under *State Farm*.") (quoting *Arent v. Shalala*, 70 F.3d 610, 616 n.6 (D.C. Cir. 1995)). Ultimately, we defer to Interior's interpretation of the statute. *Citizens Exposing Truth*, 492 F.3d at 465. Consistent with Justice Breyer's concurrence in *Carcieri*, it was not unlawful for the Secretary to conclude that a "tribe need only be 'recognized' as of the time the Department acquires the land into trust." J.A. 255.

Appellants disagree on account of what they allege is inconsistent agency interpretation of the IRA. *See Alabama Educ. Ass'n v. Chao*, 455 F.3d 386, 392 (D.C. Cir. 2006) ("When an agency adopts a materially changed interpretation of a statute, it must in addition provide a 'reasoned analysis' supporting its decision to revise its interpretation." (quoting *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983))). Appellants believe four things in particular prove their point: 1) a 1976 Department decision regarding the Stillaguamish Tribe; 2) a 1980 decision in *Brown v. Commissioner of Indian Affairs* by the Interior Board of Indian Appeals, 8 IBIA 183 (1980); 3) a 1994 Department letter to the House Committee on Natural Resources; and 4) a 2015 Department decision regarding the Mashpee Wampanoag Tribe. We reject the inferences Appellants would have us draw from each of these documents, none of which shows a "materially changed

[agency] interpretation" of the IRA. *Alabama Educ. Ass'n*, 455 F.3d at 392. Rather, "administrative practice suggests that the Department has [already] accepted th[e] possibility" that "[t]he statute . . . imposes no time limit upon recognition." *Carcieri*, 555 U.S. at 398 (Breyer, J., concurring).

The Stillaguamish Tribe's path to qualifying for IRA benefits actually shows that the IRA does not limit the benefits it confers only to tribes recognized as of 1934. Appellants point to Interior's 1976 decision denying the tribe's request to take certain land into trust, but that was not the end of the story. What they fail to mention is that Interior reconsidered this decision just a few years later, in 1980. In so doing, it concluded the opposite – that the Stillaguamish did in fact "constitute a tribe for purposes of the IRA." J.A. 527. "It is irrelevant," explained the Department, "that the United States was ignorant *in 1934* of the rights of the Stillaguamish." J.A. 526 (emphasis added). The government even went so far as to say that it did not matter that it had "on a number of occasions . . . taken the position that the Stillaguamish did not constitute a tribe." J.A. 527. Indeed, there are several instances throughout history where the United States initially has determined that a tribe "had long since been dissolved," only to correct this misapprehension later in time. *See Carcieri*, 555 U.S. at 398-99 (Breyer, J., concurring). The Stillaguamish experience is therefore consistent with Interior's position vis-à-vis the Cowlitz.

The *Brown v. Commissioner of Indian Affairs* decision is of no greater help to Appellants. 8 IBIA 183 (1980). There, the Interior Board of Indian Appeals confronted whether the appellant's Cowlitz nephew could receive a gift deed of a portion of his uncle's allotment on the Quinault Tribe reservation. To receive the gift, the nephew had to be an

"Indian" under the IRA. *Id.* at 184-85. The Board first considered if the nephew qualified on account of his inclusion on the official census roll of the "Indians of the Quinault Reservation" back "when the IRA was passed." *Id.* at 187. The uncle argued that the nephew's prior membership in that group provided the necessary statutory hook because the group had been "under Federal jurisdiction" in 1934. *See id.* at 188. The Board, however, declined "to dwell on the import of th[a]t phrase." *Id.* It was furthermore unconvinced that the "Indians of the Quinault Reservation" were "one and the same" as the present-day, federally recognized Quinault Tribe, and so rejected the uncle's argument. *Id.* at 188.

The Board therefore did not offer a contrary interpretation of "recognized" in its discussion of the nephew's membership in the "Indians of the Quinault Reservation." Nor did the Board elsewhere hold that the IRA requires Cowlitz recognition in 1934. *See* Grand Ronde Br. 13. "[I]n the absence" back in 1980 "of any evidence that [the nephew] was or is now a member of any other federally recognized tribe," *id.* at 190, the Board was left to uphold the conveyance under the IRA's second definition, *see id.* Knowing what we know now, post-2002, the conclusion that the nephew could not rely on his membership in the as-yet unrecognized Cowlitz Tribe is unremarkable. This is especially true in light of the Stillaguamish opinion, issued that same year, which confirms that the government has sometimes mistakenly taken a position that an Indian group does not constitute a tribe.

We can next dismiss outright the idea that Interior offered a contrary position in a 2015 record of decision to the Mashpee Wampanoag Tribe. *See* Grand Ronde Br. 13-14. Appellants' reliance on that decision is odd, given that Interior expressly said "there is no temporal limitation on the

term 'recognized' and therefore, recognition in 1934 is not required." J.A. 4553 n.237.

Lastly, we find no merit in Appellants' remaining argument based on the inclusion of the year, 1934, in brackets in one sentence of a 1994 letter to the House Committee on Natural Resources. *See* J.A. 4636 (paraphrasing the first definition of "Indian" as including "all persons of Indian descent who are members of any recognized [in 1934] tribe under Federal jurisdiction"). We fail to glean from those brackets or the letter any interpretation of the statute, let alone a departure from past agency interpretation; instead, the Assistant Secretary was responding to a request "to provide a list of nonhistoric Indian tribes." J.A. 4634. Even when the Supreme Court adjudicated the meaning of the the IRA's first definition of "Indian" in *Carcieri*, it was unswayed by the persuasive authority of precisely this type of parenthetical. *Compare United States v. John*, 437 U.S. 634, 650 (1978) (writing that the IRA defined "Indian" in part as "all persons of Indian descent who are members of any recognized [in 1934] tribe now under Federal jurisdiction"), *with* Brief of Petitioner at 25-26, *Carcieri v. Salazar*, 555 U.S. 379 (2009) (No. 07-526) (advocating that "[t]he bracketed phrase 'in 1934' [in *United States v. John*] . . . reflects the Court's understanding that the word 'now' restricts the operation of the IRA to tribes that were federally recognized and under federal jurisdiction at the time of enactment"), *and Carcieri*, 555 U.S. at 381-96 (nowhere citing *United States v. John* in holding that "now under Federal jurisdiction" is restricted to 1934.).

As shown above, Interior's interpretation was reasonable. Neither the agency decisions pointed to by Appellants, nor the parenthetical from the 1994 letter – nor *United States v. John*, for that matter – persuade us otherwise, and we are bound to

defer to the Board's reasonable interpretation of the statute it is charged to administer. *UC Health v. NLRB*, 803 F.3d 669, 681 (D.C. Cir. 2015).

**B.**

The Secretary's authority to take land into trust, as mentioned, is limited to "recognized Indian tribe[s] now under Federal jurisdiction," 25 U.S.C. § 479, which leads Appellants also to challenge the Secretary's determination on what is required by the IRA's jurisdictional requirement.

The Secretary interpreted "now under Federal jurisdiction" to require a two-part inquiry. J.A. 260. First, the Secretary considers:

> whether there is a sufficient showing in the tribe's history, at or before 1934, that it was under federal jurisdiction, *i.e.*, whether the United States had in 1934 or at some point in the tribe's history prior to 1934, taken an action or series of actions – through a course of dealings or other relevant acts for or on behalf of the tribe or in some instance tribal members – that are sufficient to establish, or that generally reflect federal obligations, duties, responsibility for or authority over the tribe by the Federal Government.

J.A. 260-61. The second part of the test takes into account whether the Federal-jurisdiction status remained intact in 1934. J.A. 261.

Applying this test, the Secretary detailed the government's course of dealings with the Cowlitz dating from

failed treaty negotiations at the 1855 Chehalis River Treaty Council, J.A. 263, to acknowledgment and communication with Cowlitz chiefs in the late 19th century, J.A. 264, to government provision of services into the 1900s, J.A. 265, to supervision in the 1920s by the local Taholah Agency, J.A. 265, to organization and claims efforts leading up to the ICC award, J.A. 266, to allotment activities, J.A. 267-68. Another "important action by the Federal Government evidencing the Tribe was under federal jurisdiction in 1934" was Interior's approval of an attorney contract for the Tribe in 1932, pursuant to a statute that required contracts between Indian tribes and attorneys be approved by the Commissioner of Indian Affairs and Secretary. J.A. 269. Furthermore, the Secretary explicitly rejected arguments relating to the 2005 NIGC Restored Lands Opinion, which discussed the lack of a government-to-government relationship with the Tribe, as conflating the modern, political concept of recognition with that used in the IRA, which was closer to an "ethnological and cognitive" concept. J.A. 270-71. In any event, the Secretary explained, "recognition is not the inquiry before us. Rather, it is the concept of federal jurisdiction that is addressed." J.A. 270.

Appellants urge that the phrase, "under Federal jurisdiction" is unambiguous, but we disagree. Congress nowhere in the statute gave further meaning to these words. Moreover, "jurisdiction" is a term of extraordinary breadth. Indian tribes are independent sovereigns, but at the same time "domestic dependent nations," *Cherokee Nation v. Georgia*, 30 U.S. 1, 2 (1831), and subject to the "plenary and exclusive" authority of Congress, *United States v. Lara*, 541 U.S. 193, 200 (2004). As the government notes, due to Congress's plenary powers, every Indian tribe could be considered "under Federal jurisdiction" in some sense. *See* Gov't Br. 51. As already discussed, the legislative history

provides no further clues, except that the jurisdictional nexus was meant as some kind of limiting principle. *See* Subcommittee Hearing at 266. Precisely how it would limit the universe of recognized tribes is unclear; Assistant Solicitor of the Interior Felix Cohen contemporaneously described the Senate bill as including the term, "'now under Federal jurisdiction', *whatever that may mean*." S.A. 3 (emphasis added). Interior correctly predicted at the time that the phrase was "likely to provoke interminable questions of interpretation." J.A. 398 (agency analysis of differences between House and Senate bills, 1934). Indeed it has. We easily conclude that the phrase is ambiguous.

The Secretary's two-part test is furthermore reasonable. It makes sense to take treaty negotiations into account, as one of several factors reflecting authority over a tribe, even if they did not ultimately produce agreement. This is all the more so given the context within which the particular negotiations at issue occurred. The Cowlitz refused to sign an 1855 land cession treaty proposed at the Chehalis River Treaty Council, J.A. 625, whereby Governor Stevens of the Washington Territory and other federal agents sought to move the Cowlitz to a reservation on the Pacific Coast, J.A. 660-68. The Cowlitz resisted relocation and refused the treaty, J.A. 667, but years later the United States offered the Cowlitz's land for sale to settlers without compensation anyway, J.A. 498. As the District Court explained, the fact that the government nevertheless took the Cowlitz land even after the tribe resisted the treaty corroborates that the government treated the Cowlitz as under its jurisdiction.

We are not persuaded that the Secretary's interpretation is unreasonable for failure to require a formal, government-to-government relationship carried out between the tribe and the highest levels of the Interior Department. *See* Clark County

Br. 24; Grand Ronde Br. 28 ("[T]he existence of a government-to-government relationship is the *sine qua non* of federal jurisdiction."). The statute does not mandate such an approach, which also does not follow from any ordinary meaning of jurisdiction. Whether the government acknowledged federal responsibilities toward a tribe through a specialized, political relationship is a different question from whether those responsibilities in fact existed. And as the Secretary explained, we can understand the existence of such responsibilities sometimes from one federal action that in and of itself will be sufficient, and at other times from a "variety of actions when viewed in concert." J.A. 261. Such contextual analysis takes into account the diversity of kinds of evidence a tribe might be able to produce, as well as evolving agency practice in administering Indian affairs and implementing the statute. It is a reasonable one in light of the remedial purposes of the IRA and applicable canons of statutory construction.

Appellants make several additional arguments urging that the Secretary applied the two-part test in an arbitrary and capricious manner. Appellants maintain that the Cowlitz were "terminated" as a tribe as of 1934, which is the antithesis of being under federal jurisdiction, and that "the Secretary did not even *address*" this fact. Grand Ronde Br. 26. Appellants further believe that the Tribe conceded that they had been terminated before the NIGC, while advocating that it met the restored-lands exception to the IGRA, and that the Commission accepted this concession.

This version of events is somewhat of a mischaracterization. First, the Secretary *did* consider whether the Cowlitz were previously terminated, and found "no clear evidence" that the government terminated the Cowlitz, or that the tribe otherwise lost that status. J.A. 264. Second, the

NIGC opinion is of little value when it comes to this particular inquiry. In order to meet the restored-lands exception – a requirement of the IGRA, not the IRA – the Commission interpreted the IGRA to require, *inter alia*, a period of non-recognition by the government. J.A. 1362 (citing *Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Atty. for the W. Div. of Mich.*, 369 F.3d 960, 967 (6th Cir. 2004)). So, whereas Appellants point to a 1933 quotation within the NIGC opinion, where Commissioner Collier said the Cowlitz were "no longer in existence as a communal entity," Grand Ronde Br. 24-25 (citing J.A. 1364), that sentiment goes to the government's mistaken belief at the time that the Cowlitz had been absorbed into the greater population. That error is consistent with the NIGC's conclusion that "the historical evidence establishes that the United States did not *recognize* the Cowlitz Tribe as a governmental entity from at least the early 1900s until 2002." J.A. 1363 (emphasis added). It is a conclusion about recognition – not whether the Tribe was under Federal jurisdiction. Finally, neither the Secretary nor this Court is bound by the Cowlitz's previous position before the NIGC. The Cowlitz used the term, "*de facto* termination," J.A. 1289, but essentially argued that the government failed to recognize it for a period of time, which is true.

The only additional argument we need address is the assertion that the ROD is contrary to the agency's history of "consistently" finding the Cowlitz were not under federal jurisdiction in 1934. Grand Ronde Br. 30. Appellants focus on yet another lone sentence within an agency technical report produced during the federal acknowledgment process. *See* J.A. 1076 (discussing documents that purportedly showed the Cowlitz were not a "reservation tribe under Federal jurisdiction or under direct Federal supervision"). We think this statement reflects a narrower and dated understanding

that equated land and direct supervision with jurisdiction. But the Secretary explained in the ROD that jurisdiction can be shown in more ways than that, *see* J.A. 260-63, and adequately documented the dealings that evidenced jurisdiction in 1934, *see* J.A. 267 (relying on a March 16, 1934 instruction from the Taholah agency to place Cowlitz Indians on the census roll for the Quinault Reservation); J.A. 269 (citing evidence of the agency granting "allotments [on the Quinault Reservation] to eligible Cowlitz Indians during the period from 1905 to 1930"); J.A. 269 (referencing agency approval of an attorney contract that was in the name of "the Cowlitz Tribe or Band of Indians"). At the end of the day, there is a large and complex record of Interior interactions with the Cowlitz for almost a century. The erroneous assumption that the Cowlitz no longer existed may have colored lone statements, when taken out of context, touching on aspects of jurisdiction over the Tribe. However, after reviewing the record in its entirety, we are confident that the Secretary reasonably determined the contacts between the United States and the Cowlitz from 1855 through 1934 satisfied part one of the two-part test, and that those contacts remained intact despite what was at times the agency's equivocal exercise of its authority and responsibilities.

## C.

Appellants next dispute the Secretary's determination that the Cowlitz parcel met the initial-reservation exception under the IGRA, so as to permit gaming on that land.

To recall, the IGRA's initial-reservation exception from its ban against gaming on Indian lands includes those lands taken into trust as "the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process." 25 U.S.C. § 2719(b)(1)(B)(ii).

Interior regulations require a tribe seeking to come within that exception to show, *inter alia*, that the land in question is "*within* an area where the tribe has significant historical connections." 25 C.F.R. § 292.6(d) (emphasis added). This is in contrast to the restored-lands exception, which requires at least "a significant historical connection *to the land*" itself. *Id.* § 292.12 (b) (emphasis added). A tribe can show significant historical connections by "demonstrat[ing] by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." *Id.* § 292.2. The Secretary has interpreted "vicinity" in both the initial-reservation and restored-lands context to mean "those circumstances" of use and occupancy "lead[ing] to the natural inference that the tribe also made use of the" parcel in question." J.A. 292; *see also* J.A. 4518, 4534.

The Secretary determined that the Cowlitz met the initial-reservation exception after reviewing a number of historical sources, including those relied on by the ICC and the government during the federal acknowledgment determination. The Secretary identified evidence of Cowlitz use or occupancy three miles northwest of the Cowlitz parcel, J.A. 295 (lodges and about 100 "Kowalitsk"), ten miles south, J.A. 296 (trading presence), and less than three miles north from the Cowlitz Parcel, J.A. 300-01 (Cowlitz boatmen), as well as "exclusive use and occupancy . . . within 14 miles," J.A. 298 (ICC decision). The ROD further relied on signs of a major Cowlitz battle in the 1800s less than three miles from the parcel, J.A. 299, and, only six miles from the parcel, hunting by the Cowlitz Indian Zack, who also assisted settlers during the 1855-1856 Indian war, J.A. 300. The record also includes documentation of the Tribe's presence at Fort Vancouver, J.A. 297, 301, which is south of the city of Vancouver, Washington, which itself is south of the land in

question. All of this provided sufficient "historical evidence of occupancy and use by the Cowlitz of lands in the vicinity of the Cowlitz Parcel," and "significant historical connections to the Cowlitz Parcel." J.A. 302.

Appellants attack "[t]he Secretary's IGRA ruling [as] constitut[ing] the worst sort of ad hoc decision-making." Grand Ronde Br. at 42. Specifically, they allege the Secretary: 1) used the wrong standard; 2) failed to recognize that, under the right standard, the initial-reservation test requires significant historical connections "to the parcel *itself*," which the Cowlitz cannot show; and 3) departed from agency precedent.

Appellants base their first two objections on two perceived ambiguities within the ROD. At times the Secretary used language indicating not just that the Cowlitz had a demonstrable presence within an area of significant historical connection to the parcel, but that the evidence showed a connection to the parcel itself. *Compare* J.A. 291 ("We determine that the Cowlitz Tribe has significant historical connections to the land in the vicinity of the Cowlitz Parcel."), *with* J.A. 303 ("The key question is whether the historic Cowlitz Indians had significant historical connections with the Cowlitz Parcel."). Second, although the Secretary cited the Scotts Valley Opinion, explaining that whether a tribe's use and occupancy occurred "within the vicinity" of the land at issue asks whether the circumstances "lead to the natural inference that the tribe also made use of the parcel in question," J.A. 292 (internal quotation marks omitted), the Secretary did not again use the words, "natural inference," in explaining how the numerous pieces of evidence supported the ROD's conclusion that the parcel fulfilled the IGRA's regulatory requirements.

Seeing as the Secretary ultimately "conclude[d] that the Tribe has significant historical connections with the Cowlitz Parcel," J.A. 302, any error the Secretary may have made in that regard did not amount to reversible error, *see* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). We are unconvinced that the Secretary used the wrong standard. If anything, the Secretary used the correct standard but found more than what was necessary for the initial-reservation exception. To be clear, contrary to the interpretation pressed by Grand Ronde, this exception does not mandate that historical documentation implicate the actual land where gaming will take place. The regulation provides that the Cowlitz had only to show that the parcel was "*within* an area where the tribe has significant historical connections." 25 C.F.R. § 292.6(d) (emphasis added). Indeed, the regulation's breadth comports with the agency's rejection of various, strict forms of the test suggested at the time of the regulation's adoption, which the agency feared might "create too large a barrier to tribes in acquiring lands." Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354, 29,360 (May 20, 2008); *see also Citizens Exposing Truth*, 492 F.3d at 467 ("IGRA's [initial-reservation] exception 'ensur[es] that tribes lacking reservations when IGRA was enacted are not disadvantaged relative to more established ones.'") (quoting *City of Roseville*, 348 F.3d at 1030). Thus, the agency's interpretation of its regulation was in line with its intent at the time of promulgation, and any ambiguity in the language used by the agency as it exhaustively analyzed evidence dating back to the early 1800s only shows the ROD went above and beyond fulfilling the regulatory requirements. *Cf. PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

Moving on, Appellants urge that the ROD broke from past precedent, but the gist of their argument is really that they disagree with the Secretary's finding that the record establishes "significant" connections to the parcel. *See* Clark County Br. 47 ("[T]he Secretary has required connections based on subsistence use and occupancy to be enduring, substantial, and non-speculative." (emphasis deleted)); Grand Ronde Br. 36 ("[N]ot just *any* historical connections will do."). There is no "sharp break" from the opinions regarding the Scott's Valley Band of Pomo Indians, Grand Ronde Br. 39, the Guidiville Band of Pomo Indians, Clark County Br. 50-51 & n.20, or any others, *see* Grand Ronde Br. 40 n.18. To the extent Appellants think this precedent shows Interior required a higher quantum of evidence in previous cases, those were restored-lands opinions, *see* J.A. 4303, 4336, where a connection was made "often [to] the very *heart* of the tribe's territory." Grand Ronde 39; *see also* 25 C.F.R. § 292.12(b) (necessitating "a significant historical connection *to the land*" (emphasis added)).

Appellants' strongest argument is that the agency in an opinion to the Guidiville Band said that documentation of a trade route was insufficient to establish subsistence use because "something more than evidence that a tribe merely passed through a particular area is needed." J.A. 4316. At first glance, that is in contrast to the Cowlitz ROD, where "[e]vidence of trade and trade routes . . . [wa]s a key consideration." J.A. 298. The Cowlitz ROD does not stop there, however, but continues to distinguish the Guidiville Opinion by explaining that it had not previously "conclude[d] that activities associated with a trade route or trading activities in general can never constitute evidence of significant historical connections." J.A. 299. "[S]uch activities have to be substantial enough to be more than 'a transient presence in the area,'" explained the Secretary,

J.A. 299, which is the same as its prior interpretation of the regulation, *see* J.A. 4316 (requiring in the Guidiville Opinion "something more than a transient presence in an area").

The ROD is supported by substantial evidence amply showing that Interior found the Cowlitz parcel to be within a broader area of historical significance to the Tribe. J.A. 292-302. The decision is not otherwise arbitrary or capricious, and thus we find no merit in Appellants' challenges on this front.

**D.**

The Clark County Appellants alone bring these next claims stemming from the Tribe's membership growth in the time since its federal acknowledgment application. We reject them all.

In April 2006, Interior issued a DEIS for the casino. The agency subsequently received comments requesting that it provide the tribe's business plan, which is required as part of the tribe's fee-to-trust application package. *See* 25 C.F.R. 151.11(c) ("Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed use."). The plan showed the Tribe had 3,544 members. It also stated the Tribe would require approximately $113 million annually for its "unmet needs," or, in other words, to fund government infrastructure, programs, and services. The Secretary appended the plan to the FEIS, which included the $113 million figure from the plan in the FEIS Purpose and Need statement.

Appellants protest that the Tribe's new membership level from the business plan represents a dramatic increase from

1,482 members in 2002, when the Cowlitz were first federally acknowledged. *See* Clark County Br. 27-28. Under IRA regulation 25 C.F.R. § 83.12(b) (1994),[7] the Cowlitz had submitted a list of members as part of the federal acknowledgment process, which became its official "base roll" for federal funding and other purposes. That regulation also provides that additions to the roll must meet certain criteria, such as "maintaining significant social and political ties with the tribe," *see* Clark County Mot. Summ. J. 25 (citing 25 C.F.R. § 83.12(b) (1994)), and so Clark County believes the agency had a duty to verify the membership increase, *see* Clark County Br. 27-28. Clark County additionally argues that the agency had a duty under NEPA's implementing regulations to verify the Tribe's self-reported unmet economic needs. Clark County Br. 35-39. Appellants' concern in that regard relates back to the agency's consideration of the range of reasonable alternatives, *see Confederated Tribes*, 75 F. Supp. 3d at 420-21; Interior had originally identified nineteen possible project locations, but eliminated five locations that were north of the parcel as too inconvenient to the Seattle and Portland markets to "adequately meet the economic objectives and needs of the Tribal government," *id.* at 420 (citing J.A. 2805).

We first reject any claim regarding 25 C.F.R. § 83.12(b) as forfeited. Clark County never raised to the agency a duty to verify membership enrollment pursuant to this regulation. The best Appellants can point to are letters expressing the County's concern to the agency about the business plan and the Tribe's unmet needs in reference to the NEPA process.

---

[7] In 2015, Interior updated and revised the Part 83 regulations, eliminating this particular "base roll" limitation provision. *See* Federal Acknowledgment of American Indian Tribes, 80 Fed. Reg. 37,862, 37,885 (July 1, 2015).

*See* J.A. 2144-46 (letter to BIA submitting supplemental comments to the DEIS); J.A. 2375 (letter to Interior arguing that the tribe is using inflated member statistic in its "Business Plan to inflate its tribal needs to constrain BIA review and short circuit the NEPA process"); *see also* Clark County Br. 30 (citing to instances in the record where it framed the expansion issue in terms of NEPA reasonable alternatives). Not only did Clark County fail to invoke Section 83.12(b) in express terms, but it was not "necessarily implicated" in discussion of an entirely different statutory scheme. *NetworkIP, LLC v. FCC*, 548 F.3d 116, 122 (D.C. Cir. 2008). And despite referencing NEPA in these letters, Appellants fail to point us to any of their comments to the FEIS raising concerns about Cowlitz membership levels. This directly undercuts their claim that the Secretary failed to address questions about the Tribe's expanded enrollment. While some comments responding to the FEIS referenced the Tribe's unmet needs figure, as opposed to membership levels, *see, e.g.*, J.A. 3381, 3413, the Secretary fully addressed all questions about the business plan actually raised before the agency, *see* J.A. 191 (determining agency review of a "Tribe's internal economic planning strategy document" to "be inappropriate and contrary to federal Indian policies encouraging tribal sovereignty, self-determination and self-governance").

We are similarly unpersuaded that the Secretary had an obligation under NEPA regulation 40 C.F.R. § 1506.5(a) to verify that the Cowlitz's unmet needs report was accurate. *See* Clark County Br. 35-39. That regulation provides that "[i]f an agency requires an applicant to submit *environmental information* for possible use by the agency in preparing an environmental impact statement . . . [t]he agency shall independently evaluate the information submitted and shall be responsible for its accuracy." *Id.* § 1506.5(a) (emphasis

added). Neither the annual unmet needs figure complained of here, nor the membership numbers that purportedly inflated the Tribe's unmet needs, are environmental in nature. It may be the case that Section 1506.5(a) might in other circumstances apply to some kind of information that is simultaneously socioeconomic and environmental, as Appellants argue. *See* Clark County Br. 37. But at least as presented here, Clark County's quarrel is that the agency's failure to do its own investigation resulted in excluding from consideration reasonable alternatives located farther away from competing casino interests. *See* Clark County Br. 38; *see also* J.A. 3366 (lamenting the economic impact of the "emergence of a tribal casino on the outskirts of" La Center, Washington). That is the gravamen of this particular complaint, which we are not convinced is appropriately pursued under Section 1506.5. As Clark County did not challenge on any other grounds the decision to exclude certain allegedly reasonable alternatives from the FEIS, *see Confederated Tribes*, 75 F. Supp. 3d at 419-20, we have no occasion to rule on those issues. Clark County ultimately cannot prevail in any of its claims related to the Tribe's membership or business plan.

\*\*\*

For all of the foregoing reasons, we affirm the judgment of the District Court in its entirety.

*So ordered.*